[No. G038539. Fourth Dist., Div. Three. Sept. 30, 2009.]

RAYMOND C. KALDENBACH, Plaintiff and Appellant, v.
MUTUAL OF OMAHA LIFE INSURANCE COMPANY et al., Defendants
and Respondents.

COUNSEL

Coughlin & Conforti, Frank J. Coughlin and Beverly A. Blais for Plaintiff and Appellant.

Barger & Wolen, Sandra I. Weishart and Misty A. Murray for Defendants and Respondents.

OPINION

**O'LEARY, Acting P. J.**—Raymond C. Kaldenbach brought an action against United of Omaha Life Insurance Company and Mutual of Omaha Life Insurance Company (collectively Mutual), concerning the sale of a so-called "vanishing premium" life insurance policy. He alleged causes of action for violation of the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.), the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), and common law fraud and concealment. His motion for certification of the action as a class action was denied after the trial court concluded he

had demonstrated none of the requisites for class certification. Kaldenbach appeals contending he established all requisites for class certification. We disagree and affirm the order.

I

## BACKGROUND

Before addressing this particular case, we find it useful to provide this background on vanishing premium life insurance litigation, which was nicely laid out in a sister-state case *Gaidon v. Guardian Life Ins. Co. of America* (1999) 94 N.Y.2d 330 [704 N.Y.S.2d 177, 725 N.E.2d 598, 602–603]: "The cases before us are not unique. They involve allegations and practices of a national scope that have generated industry-wide litigation [citation]. In resolving this case, we consider the various types of cash value life insurance that are marketed, and the import of 'vanishing premiums' in that setting. [¶] All the policies in the appeals before us provide 'whole life' or 'universal life' insurance—each a form of 'cash value' life insurance. Cash value life insurance combines 'pure' life insurance with an investment component that creates a potential accumulation of money in the policy [citations]. In a cash value policy, the carrier typically invests accumulated money and pays returns to the policyholder in the form of dividends or interest [citation]. [¶] When cash value insurance first emerged, insurance companies invested accumulated money exclusively in conservative securities with fixed interest rates, such as municipal and corporate bonds [citation]. Commentators point out that because interest rates 'soared' in the late 1970s and early 1980s, the economics of these cash value life insurance policies became unattractive to investors who sought to take advantage of the high interest rates [citations]. In the mid-1980s, the life insurance industry reacted to its diminishing market share by designing policies, like the ones here at issue, in which policyholders' accumulated money is tied to the current rate of interest [citation]. [¶] Carriers marketed interest rate-sensitive insurance under a host of premium payment options, including the 'vanishing premium' plan [citation]. Under this plan, the policyholder pays higher-than-normal premiums in the early years of the policy, resulting in a quicker accumulation of premium dollars for investment purposes [citations]. These policies are marketed on the premise that enough cash value will accumulate so that at a fixed date future administrative and insurance costs will be covered and the policyholder relieved of any further out-of-pocket premium obligations [citation]. [¶] In the late 1980s, however, sharply declining interest rates 'upset the economics' of these widely marketed policies [citation]. Accumulated cash values became insufficient to pay expected future insurance and administrative costs. By the

early 1990s, many consumers who purchased such policies were required to continue out-of-pocket payments to keep their policies in force [citation]. And the lawsuits followed." (See also Fischel & Stillman, *The Law and Economics of Vanishing Premium Life Insurance* (1997) 22 Del. J. Corp. L. 1, 4; *Drelles v. Manufacturers Life Ins. Co.* (2005) 2005 PA Super 249 [881 A.2d 822]; *Vos v. Farm Bureau Life Ins. Co.* (Iowa 2003) 667 N.W.2d 36 (*Vos*).)[1]

II

FACTS[2]

*Kaldenbach's Complaint*

In 2004, Kaldenbach filed this class action complaint against Mutual and Robert A. Meyerson, the insurance agent who sold Kaldenbach the life insurance policy that is the subject of this action. Kaldenbach alleged he was induced through improper and deceptive sales practices to purchase Mutual's Advantage Life Policy (ALP)—a whole life insurance policy with a "vanishing premium" component.

Kaldenbach purchased the ALP policy in 1990, at age 56, with a death benefit of $100,000, and maturity date of age 95. Based on Meyerson's representations about the policy, Kaldenbach believed that after paying four annual premiums of $3,162 ($12,648 total), the accumulated cash reserves on his policy would cover all future premiums. Kaldenbach made the four

---

[1] One case describes such a policy as follows: "Generally speaking, so called '[v]anishing premium policies are paid dividends which in some instances can be sufficient to cause the premium to "offset" whereby dividend values are used to pay the premium. In such an instance, the cash premium "vanishes" and is no longer due from the insured.' [Citation.]" (*Keyes v. Guardian Life Ins. Co. of America* (S.D.Miss. 2000) 194 F.R.D. 253, 254, fn. 1, quoting *Phillips v. New England Mutual Life Ins. Co.* (S.D.Miss. 1998) 36 F.Supp.2d 345, 347.) Another case explains: "Vanishing premium policies operate by applying the insured's initial premium payments toward the costs of insurance, commissions, and various fees, while investing subsequent funds to accumulate cash value and generate an investment return designed to 'pay' for the policy from the date on which premium obligations are designed to cease until the policy's maturity date. Therefore, if the policy performs as planned, the insured receives an investment vehicle which ultimately provides 'free' insurance during the policyholder's retirement years. [¶] Vanishing premium policies are, however, complex devices whose performance depends upon numerous sensitive variables, including interest, mortality rates, sales, and actuarial rates." (*Adams v. Kansas City Life Ins. Co.* (W.D.Mo. 2000) 192 F.R.D. 274, 276.)

[2] We ordered portions of the appellant's appendix containing Mutual's confidential and proprietary documents that were placed under seal by the trial court to remain under seal. (Cal. Rules of Court, rule 8.160(c)(1) [record sealed by trial court to remain under seal in appellate court].) In our recitation of the facts, we have refrained from discussing those materials.

annual premium payments, and then paid no premiums for many years. But in 2002, he was notified by Mutual the accumulated cash reserves were no longer adequate to continue paying the premium and the policy would lapse if he did not start making premium payments again.

Kaldenbach alleged Mutual provided computer illustrations and uniform sales materials to its agents that allowed Meyerson to mislead him into believing a low cost of actual insurance combined with a very high rate of interest to be earned on the cash accumulation component of his premium payment would act in concert to generate adequate returns to cover the cost of his life insurance until the maturity date of the policy. But, he alleged, in reality (given a higher cost of mortality and declining interest rates), the policy could not perform in the manner represented to him. Mutual did not advise policy purchasers of the inherent risks in purchasing the ALP.

Kaldenbach's complaint alleged causes of action for violation of the UCL and the CLRA. He also alleged common law causes of action for fraud and concealment.

*Class Certification Motion*

Two years after filing his complaint, Kaldenbach filed a motion for class certification. Although Kaldenbach identified three proposed subclasses, on appeal he has abandoned all but one: Californians who purchased ALP's from Mutual between January 1, 1988, and December 31, 1995. Kaldenbach claimed all sales of ALP's were based on the same scripted sales presentations and computer illustrations that were misleading and omitted material facts. He asserted Mutual's sales operations and presentations relating to ALP's were uniform in every respect and Mutual utilized standardized training methods, materials, and scripts. Agents were required to adhere to a sales script, and were specifically trained to disclose only the potential benefits of the policy but conceal the risks.[3]

Kaldenbach argued class adjudication was proper because (1) class members all bought the same policy; (2) Mutual utilized uniform or standardized training materials; (3) Mutual conducted training programs for agents and asked agents to memorize training presentations; (4) Mutual provided uniform computer-based illustrations for use during sales presentations; and (5) the sales brochures and point of sale materials given to prospective purchasers were uniform.

---

[3] In his opening brief, Kaldenbach states he is abandoning the scripted sales presentation theory for class certification. But it appears the theory is not abandoned, as throughout his brief he refers to alleged commonality in agents' sales presentations, including common omissions and representations mandated by Mutual's training, as a reason for class certification.

The class certification motion was supported by numerous declarations. In his declaration, Kaldenbach stated he bought the ALP in early 1990. He was retiring from public employment at age 56 and intended to select the Public Employees' Retirement System (PERS) pension option that provided the highest possible monthly benefit. That meant, however, that if Kaldenbach predeceased his wife, her survivor benefit would be decreased. Accordingly, Kaldenbach wanted to buy a whole life policy with a $100,000 death benefit payable to his wife to make up the income gap. He wanted to pay only a one-time premium. Meyerson explained the ALP product would require he pay four annual premiums, but after that no further premiums would be required. Meyerson showed Kaldenbach a computer illustration that showed only four premium payments of $3,162 per year "followed by zeros." After paying the fourth premium in 1993, Kaldenbach received annual premium notices, but Meyerson and a Mutual customer service representative said he did not have to make further premium payments.

In 2003, Kaldenbach received notice from Mutual that if he did not commence making annual premium payments of $3,845.84, his policy would be cancelled. When Kaldenbach purchased the policy, he was not advised that if interest rates and/or costs of insurance varied negatively from the assumptions Meyerson put into the illustration, he would not maintain sufficient cash accumulation to cover the future cost of insurance.

Meyerson declared he became a Mutual sales agent in the fall of 1989. In the mid-1990's, he was promoted to district sales manager and participated in training agents. He was familiar with all training materials used by Mutual from 1989 to 2000.

Meyerson explained the ALP policy had a required four-year premium minimum after which the premium was flexible. There were two components to the premium: cost of insurance and cash accumulation. Meyerson was trained the cash accumulation component would earn interest and when the cash value increased sufficiently, the annual premium could "vanish."

When making a sale, Meyerson used Mutual's proprietary software on which he could generate an illustration of how the policy worked. The illustration was a standard part of selling the insurance. The illustration was divided into two columns. One side was the "guaranteed" column. For each year it showed the minimum amount of interest Mutual would credit to the cash accumulation account—3 percent. It also showed a maximum cost of mortality (i.e., the actual cost of the life insurance) that Mutual would charge. That guaranteed side of the illustration demonstrated the cash accumulation

would not be sufficient to permanently vanish the premium. But Meyerson said he was trained to explain to prospects the "guaranteed" side of the illustration was highly improbable, and to deemphasize its significance, because historically Mutual credited significantly higher interest rates and did not charge the maximum cost of mortality.

Meyerson would then utilize the "illustration" side of the document to input numbers (i.e., using as variables, the interest rate, the amount of premium paid in the first four years, and the cost of mortality) to "solve" for when the premium could vanish. In his experience, most purchasers wanted the premium to vanish around retirement age. Meyerson was trained that as to each prospective purchaser, he was to determine that person's "dominant buying motive" and tailor his sales pitch to that motive. He prepared the illustration for Kaldenbach to match his specific motives and financial needs. He believed that based on the illustrations he showed Kaldenbach, Kaldenbach reasonably believed that absent some major economic catastrophe or some massive mortality-causing calamity that drove up the cost of insurance, he would only ever have to make the first four annual premium payments.

Kaldenbach submitted a declaration from John Cressman, an insurance practices expert. Cressman opined the marketing materials and illustrations utilized by Mutual were deceptive and misleading because they did not sufficiently disclose the risk of the investment vehicle and allowed the agent to input unrealistic projections as to interest rates. He stated there was a 70 percent lapse rate with such policies, demonstrating the vast majority of purchasers received no benefit from them.

Kaldenbach also submitted declarations from individuals who purchased 11 ALP policies from different agents. Each bought the policy after having been told about the cash accumulation feature, understanding the fund could grow to an amount sufficient to pay the premiums until maturity. Each stated that several years down the road, either the premiums did not vanish or after having gone without paying premiums for some years, they were required to resume making payments. All of the declarants stated the sales agents had "documents" to which they referred, but most made no mention of receiving any sort of illustrations demonstrating the vanishing premium concept. Three mentioned seeing a chart with columns or numbers; one specifically mentioned being shown an illustration. The policy application signed by each declarant stated the applicant was required to make the planned premium payment for the first four years. Then starting in the fifth policy year, the applicant could either adjust the death benefit and premium being paid, or

stop paying premiums altogether in which case "[y]our coverage will continue *as long as the cash value is sufficient.*" (Italics added.)

*Mutual's Opposition*

Mutual's attorney submitted her declaration stating that pursuant to court order 500 policy owners were given notice of the proceedings and asked if they would consent to production of their policy files. Only 37 policyholders gave consent.

Robert Hupf, a Mutual officer and actuary, submitted his declaration regarding Mutual's various universal life insurance products. He explained that with the ALP, beginning in the fifth year, the insured could stop paying the premiums and remain covered so long as the cash accumulation was sufficient to continue paying the fixed premium. Kaldenbach's policy specifically stated he had a planned annual premium of $3,162, payable every year until the policy matured at age 95. If beginning in the fifth year Kaldenbach discontinued his annual premium payment, the policy would remain in effect until the cash accumulation was insufficient to pay the cost of insurance (or maturity date of the policy, whichever came first). The policy specifically stated that assuming the guaranteed 3 percent interest rate and the guaranteed cost of insurance, Kaldenbach's policy would remain in force until December 2002.

Hupf stated the information given to each prospective purchaser varied. In providing the computer illustration to a prospective purchaser, an agent could input "virtually limitless variables." Mutual had no control over what a particular agent would illustrate as it would depend on the purchaser's age, risk, motives, coverage, and the amount of premium he or she wanted to pay.

Mutual's sales development manager, Karen Amstuz, submitted a declaration concerning training of agents. Mutual had multiple sales methods and there was no single or standardized method. When new sales methods or materials were adopted, Mutual did not require all agents to use them and the amount of training agents received depended on the policies of the individual insurance sales office.

All of Mutual's agents are independent contractors and the company "cannot insist they read any training materials or use a specified sales method." Veteran agents would continue to use their own methods regardless of any new method developed by Mutual. Amstuz explained the content of each sales presentation "was left up to the agent's sole discretion and would vary from agent to agent and prospect to prospect," depending on the purchaser's needs. There were no materials from Mutual instructing agents to

sell ALP's by promising a purchaser only a fixed number of premium payments would be required to pay the policy in full.

Mutual submitted a declaration from an insurance and actuarial expert, Jeffrey C. Harper. Harper explained the basic concept and purposes of universal life policies like the ALP. He stated a 70 percent lapse rate for universal life insurance policies was not evidence policyholders received no benefit from the policy. Harper explained the lapse rate was well within the range of industry experience with many types of insurance. Policies lapse for many reasons, including that the policyholder has intentionally used all the accumulated cash value to cover the costs of premiums or that the policyholder has requested the company pay out the surrender value of the policy (i.e., cashed it out). But "[t]here is no reason to assume that any termination, let alone all terminations, has any relationship to the design of [the policy]. A termination is more likely due to circumstances unique to each policy owner." Furthermore, termination does not equate to having received no benefit from buying the policy because the policyholder had the benefit of the insurance coverage during the time the policy was in effect.

Another vice-president of Mutual stated in his declaration that before 1997, there was no requirement insurance agents provide any written materials to purchasers during a sales presentation. Use of illustrations and written materials became a legal requirement in 1996, and prior to that, not all agents used them. There were numerous reasons the owner of an ALP would let it lapse, not just renewed premiums. The computer illustrations were hypothetical scenarios, not promises about the future performance of the policy values.

Mutual submitted declarations from several of its independent sales agents. Each explained that although they received training and materials from Mutual, sales presentations were not uniform or scripted because each sale was adapted to the individual prospect's needs, goals, and experience. Agents were not required to attend training or use the prepared materials. As for illustrations, the information input into the illustration was entirely within the independent agent's control. Although a "vanish" date was possible, agents were not trained to demonstrate a guaranteed "vanish" date as it would be entirely dependent on fluctuating interest rates.

The agents declared they did not hide the guaranteed side of the illustration. They would typically explain the guaranteed column was a worst case scenario, the illustration column was a best case scenario, and the reality would "end up being somewhere in the middle . . . because interest rates would fluctuate." The only way to know if a policy was sold by demonstrating to the purchaser a vanish date for premiums "would be to interview the prospect, the agent, and any other individuals involved in the transaction, and

review the documents generated or used in connection with that sales transaction." Mutual submitted evidence that while it offered training for new agents, training was not mandatory and each local office decided whether or when to have agents attend training.

Mutual also submitted deposition testimony from Meyerson and Kaldenbach. Meyerson testified his sales presentation to Kaldenbach was "atypical" because he was a "dominant needs" not a "dominant buying motive" prospect. Meyerson testified it was not his custom to use any of Mutual's promotional materials and he did not use any of them with Kaldenbach (other than the illustration). He denied using any scripted sales presentation or any of his training materials to make the sale to Kaldenbach.

Kaldenbach testified he did not receive any written material from Meyerson during the sales presentation and relied completely on what Meyerson told him about the policy. Kaldenbach recalled receiving the policy from Meyerson, and looking at a few key items in it with him. He was told he had 20 days to review the entire policy and cancel for a full refund if he decided he did not want it. Kaldenbach did not read the policy, relying completely on Meyerson's oral representations.

*The Order*

The trial court denied the motion for class certification. It concluded Kaldenbach had not demonstrated *numerosity* other than his assertion that over 4,000 policies were sold. Kaldenbach had not shown *ascertainability* as there was no evidence as to how it could be shown which of the policyholders had received illustrations during the sales presentation.

The court concluded Kaldenbach had not shown *typicality* because Meyerson testified in his deposition that the sale to Kaldenbach was not typical as he had a clearly defined dominant need. Kaldenbach testified he never received any explanation from Meyerson about how the policy worked, how interest rates or costs of insurance were determined, what the extent of his obligation to pay annual premiums was, and what might happen if he stopped paying premiums. By contrast, Meyerson testified he fully explained the policy to Kaldenbach. "If [Kaldenbach] and Meyerson cannot even agree as to what was stated during the [sales] presentation to [Kaldenbach], how can [Kaldenbach's] claim be typical [and] be used to prove 4,000 claims? . . . It will take . . . individual evaluation of each claim to determine liability."

The court also found Kaldenbach had not established *commonality*. Kaldenbach primarily relied upon uniformity in Mutual's sales materials, training, and illustrations, but there was no evidence linking those common

tools to what was actually said or demonstrated in any individual sales transaction. The training materials and methods were not uniform throughout the class period. None of the allegedly scripted or memorized sales materials covered the alleged misrepresentations. And there was no evidence that uniform training or sales materials were used with each putative class member. There was no evidence all independent agents were required to take the offered training, took the offered training, had the same training, or used the same training or materials in their sales presentations. In fact "[t]here was evidence that the agents were free to ignore the training and written manuals." Mutual's agents were independent contractors over whom Mutual had little or no control. Meyerson testified he did not follow his training or manuals in making the presentation to Kaldenbach. Kaldenbach had argued commonality could be found based solely on the use of illustrations, but Kaldenbach testified he never looked at the entire illustration, he only looked at the part of the illustration that showed the premium could vanish in four years because that was what Kaldenbach wanted.

The court also believed varying applicability of the statute of limitations and the delayed discovery rule to each putative class member's claim precluded class certification. The court noted the 70 percent lapse rate Kaldenbach alleged occurred with the policy at issue did not establish classwide liability. There was no evidence it was an unusual lapse rate and no evidence as to why the policies had lapsed. For example, individual policyholders may have taken loans out against the cash accumulation, or they may have decided to purchase a different product or no longer needed the coverage. "[A]nalysis of why a policy lapsed is just one more issue that would need to be addressed on an individual and not class wide basis."

Finally, the court listed the individualized issues that predominated and which could not be proven on a classwide basis including: (1) did the agent take Mutual's training and read Mutual's manuals; (2) did the agent always use the training and materials; (3) what materials, disclosures, representations, and explanations were given to any given purchaser; (4) was an illustration used; (5) what information was input into the illustration; (6) did the purchaser rely on representations made in the sales presentation; (7) what were the customer's individual needs; (8) when did each class member's cause of action accrue; and (9) did the individual class member's policy lapse, and if so, why?

## III

### CERTIFICATION OF CLASS ACTIONS; APPELLATE STANDARD OF REVIEW

■ " 'Courts long have acknowledged the importance of class actions as a means to prevent a failure of justice in our judicial system. [Citations.] " 'By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress . . . .' " [Citation.] Generally, a class suit is appropriate "when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer." [Citations.] But because group action also has the potential to create injustice, trial courts are required to " 'carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts.' " [Citations.]' [Citation.]" (*Lebrilla v. Farmers Group, Inc.* (2004) 119 Cal.App.4th 1070, 1074 [16 Cal.Rptr.3d 25] (*Lebrilla*), citing *Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 434–435 [97 Cal.Rptr.2d 179, 2 P.3d 27] (*Linder*).)

■ "Code of Civil Procedure section 382 authorizes class suits in California when ' "the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." To obtain certification, a party must establish the existence of both an ascertainable class and a well-defined community of interest among the class members. [Citations.] The community of interest requirement involves three factors: "(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." [Citation.]' " (*Lebrilla, supra,* 119 Cal.App.4th at p. 1074.)

■ As the moving party, Kaldenbach bore the burden of establishing the propriety of class certification. (*Linder, supra,* 23 Cal.4th at p. 435.) The trial court has great discretion with regard to class certification, and its decision will not be disturbed on appeal if it is supported by substantial evidence, unless it was based upon improper criteria or erroneous legal assumptions. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 [174 Cal.Rptr. 515, 629 P.2d 23]; *Lebrilla, supra,* 119 Cal.App.4th at p. 1074.)

Ordinarily, appellate review is not concerned with the trial court's reasoning but only with whether the result was correct or incorrect. (See, e.g., *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].) But on

appeal from the denial of class certification, we review the reasons given by the trial court for denial of class certification, and ignore any unexpressed grounds that might support denial. (*Bartold v. Glendale Federal Bank* (2000) 81 Cal.App.4th 816, 828–829 [97 Cal.Rptr.2d 226].) We may not reverse, however, simply because *some* of the court's reasoning was faulty, so long as *any* of the stated reasons are sufficient to justify the order. (*Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 655–656 [22 Cal.Rptr.2d 419] (*Caro*).) " ' "Any valid pertinent reason stated will be sufficient to uphold the order." [Citation.]' [Citation.]" (*Lebrilla, supra*, 119 Cal.App.4th at p. 1074.)

## IV

## COMMON QUESTIONS OF LAW AND FACT

The trial court concluded class certification was inappropriate because Kaldenbach failed to prove each requisite for class certification: numerosity, ascertainability, typicality, and commonality. Kaldenbach attacks the court's reasoning, asserting that because he presented evidence supporting each requisite for class certification, denial of class certification was not justified. But we are concerned with whether substantial evidence supports the court's reasoning, not with whether there was evidence that might have supported a different conclusion. We conclude the trial court's denial of class certification was not an abuse of discretion because substantial evidence supports the court's conclusion individual factual issues relating to each class member predominated—i.e., common questions of fact and law did not predominate.

Federal courts have actively addressed the issue of class certification in "vanishing premium" cases asserting both fraud and breach of contract causes of action. Class certification has routinely been denied primarily because individualized issues predominated over common ones.

For example, in *Cohn v. Massachusetts Mutual Life Ins. Co.* (D.Conn. 1999) 189 F.R.D. 209, the plaintiffs (like Kaldenbach) asserted the predominance requirement was met based on allegedly uniform computer illustrations produced by company software, sales material, and company training programs. (*Id.* at p. 212.) The court rejected the contention: "Though there are issues common to the members of the proposed class, including in particular the actions and state of mind of [the insurer] in pursuing the vanishing premium marketing strategy, these common questions are overshadowed by individualized issues such as the nature of the oral representations or disclosures made by the agent or broker at the point of sale, the nature of any questions asked by the consumer, the content of any written illustrations or disclosures given to the consumer, the degree of care exercised by the

consumer in reviewing any written illustrations and the policy instrument, the portions of the offer that were attractive to the consumer, the degree of the consumer's financial sophistication and his or her understanding of the product. These individualized issues, which are essential to the determination of the claims of each class member, predominate over questions common to the class." (*Id.* at p. 218.)

In *In re Jackson National Life Ins. Co. Premium Litigation* (W.D.Mich. 1998) 183 F.R.D. 217, the court denied class certification noting the insurer did not generally communicate directly with prospective consumers or policyholders. Rather, policies were sold by independent insurance brokers, who were not required to follow uniform sales scripts and who were not subject to and did not follow uniform policies regarding distribution of policy illustrations. "[T]his freedom led to great variance in representations made by brokers; some explaining away and others even exacerbating any misleading tendencies the policy illustrations may have had." (*Id.* at p. 221.) The court concluded a "determination of whether and which illustrations were given to class members, and of the nature of oral representations made to them at the point of sale, . . . are matters requiring individualized fact development." (*Ibid.*) In addition, "the materiality of the allegedly misleading illustrations and plaintiffs' reliance on them" were "fact issues requiring individualized treatment." (*Ibid.*)

Other federal courts have reached similar conclusions. (See, e.g., *In re LifeUSA Holding Inc.* (3d Cir. 2001) 242 F.3d 136, 145–148 [no class certification because commonality, predominance, and superiority requirements were not met]; *Keyes v. Guardian Life Ins. Co. of America, supra*, 194 F.R.D. 253, 257 [class certification denied because facts did not support finding "defendant's policies were sold in a sufficiently uniform manner so as to justify a finding that common issues predominate"]; *Adams v. Kansas City Life Ins. Co., supra*, 192 F.R.D. 274, 279 [class certification denied because individualized fact-specific issues predominated on fraud-related claims as reliance would be based on varying oral and written representations made by agent]; *Rothwell v. Chubb Life Ins. Co. of America* (D.N.H. 1998) 191 F.R.D. 25, 30–31, fn. omitted [class certification denied because "even if plaintiffs were able to prove at trial that [insurer] trained its agents to use the policy illustrations in a misleading manner, it still would not eliminate the need for a 'mini-trial' on each class member's claim to determine the nature of the representations that were made in that case" and resolution of fraud-based claims would require proof "both that [insurer's] agents made misrepresentations and that the individual class members reasonably relied on those representations in purchasing their insurance policies"]; see also *Kent v. SunAmerica Life Ins. Co.* (D.Mass. 2000) 190 F.R.D. 271; *In re Hartford Sales Practices Litigation* (D.Minn. 1999) 192 F.R.D. 592; *Parkhill v. Minnesota*

*Mutual Life Ins. Co.* (D.Minn. 1999) 188 F.R.D. 332.) State courts have followed the federal courts' lead denying certification because adjudication required individualized inquiry into what representations or omissions were made by individual agents to individual purchasers. (See *Vos, supra,* 667 N.W.2d 36.)

In his opening brief, Kaldenbach makes no mention of the abundant federal cases denying class certification. In his reply brief, he refers us to two cases that he states have granted class certification. The first, *Cope v. Metropolitan Life Ins. Co.* (1998) 82 Ohio St. 3d 426 [1998 Ohio 405, 696 N.E.2d 1001], was not a vanishing premium case. It concerned the targeting of existing policyholders and selling them replacement insurance as new insurance without providing mandatory disclosure warnings. The second, *In re Prudential Ins. Co. of America Sales Practices Litigation* (D.N.J. 1997) 962 F.Supp. 450, 513–515, affirmed in *In re Prudential Ins. Co. of America Sales Practice Litigation* (3d Cir. 1998) 148 F.3d 283, 315, concerned a nationwide settlement-only class certification. But in that case, the evidence showed oral misrepresentations made by agents throughout the country were "virtually identical" because agents were trained uniformly and required to use uniform sales materials.

Here, Kaldenbach's argument for class certification was based on his assertion Mutual utilized uniform sales materials, training, and illustrations in marketing ALP's. But as the trial court found, there was no evidence linking those common tools to what was actually said or demonstrated in any individual sales transaction. The record demonstrates Mutual's training materials and methods were not uniform throughout the class period of 1988 through 1995. A Mutual vice-president declared that before 1997, there was in fact no requirement insurance agents provide any written materials or illustrations to purchasers during a sales presentation, and not all agents used them. Indeed, in the 13 declarations Kaldenbach submitted from other purchasers of ALP's, the vast majority made no mention of having ever been shown an illustration. During the class period, Mutual's independent sales agents were not required to take the offered training, nor were they required to utilize any particular sales method or materials in their sales presentations—to the contrary, they were free to ignore the training and written materials. Meyerson testified he did not follow his own training in making his sales presentation to Kaldenbach or use any of the sales materials provided by Mutual. Kaldenbach testified he was not given any written materials other than the illustration and the policy—he relied solely on Meyerson's representations. There was also evidence Mutual had no control over what a particular agent would illustrate for a prospective purchaser, as the agent could rely on limitless variables including the purchaser's age, risk, motives, coverage, and the amount of premium he or she wanted to pay.

In view of the foregoing, the court did not abuse its discretion in concluding individualized issues predominated and could not be proven on a classwide basis, including: whether the agent who sold a policy to any given class member took Mutual's training, read its manuals, and routinely followed the training and materials; what materials, disclosures, representations, and explanations were given to any given purchaser; what information was input into the illustration; whether the purchaser relied on representations made in the sales presentation; what the purchaser's motivation was for buying the ALP; and whether, when, and why the policy lapsed.

*UCL Cause of Action*

■ We turn then to how those various individualized issues relate to Kaldenbach's UCL cause of action.[4] The UCL "prohibits unfair competition, including unlawful, unfair, and fraudulent business acts." (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1143 [131 Cal.Rptr.2d 29, 63 P.3d 937] (*Korea Supply*); see Bus. & Prof. Code, § 17200.) The UCL is a broad statute that defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." (Bus. & Prof. Code, § 17200.) "[A] practice may be deemed unfair even if not specifically proscribed by some other law" (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527]) "if it ' " 'offends an established public policy . . . or [is] substantially injurious to consumers.' . . ." ' " (*People v. Duz-Mor Diagnostic Laboratory, Inc.* (1998) 68 Cal.App.4th 654, 658 [80 Cal.Rptr.2d 419].) A business practice is fraudulent under the UCL if a plaintiff can show that " ' "members of the public are likely to be deceived." ' " (*Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255, 1261 [39 Cal.Rptr.3d 634].)

■ Although a private citizen can sue under the UCL, only equitable remedies are available (e.g., injunction, restitution), and damages are not an available remedy. (*Korea Supply, supra*, 29 Cal.4th at p. 1144.) Prior to the passage of Proposition 64 in 2004, any person acting for the general public

---

[4] Kaldenbach also alleged a cause of action for violation of the CLRA, which prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer . . . ." (Civ. Code, § 1770, subd. (a).) While this appeal was pending, the Supreme Court issued its opinion in *Fairbanks v. Superior Court* (2009) 46 Cal.4th 56 [92 Cal.Rptr.3d 279, 205 P.3d 201] (*Fairbanks*), holding life insurance is neither goods nor services and thus not subject to the remedial provisions of the CLRA. (46 Cal.4th at p. 59.) We invited the parties to submit supplemental letter briefing concerning *Fairbanks*. Kaldenbach has advised us that in view of the *Fairbanks* decision, he withdraws his CLRA claim. Accordingly, we need not discuss the court's order denying class certification as to that cause of action.

could sue for relief from unfair competition; but after passage of Proposition 64, a private person has standing to sue only if he or she "has suffered injury in fact and has lost money or property as a result of the unfair competition." (Bus. & Prof. Code, § 17204, as amended by Prop. 64, § 3; see *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 227 [46 Cal.Rptr.3d 57, 138 P.3d 207].)

A private person "may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements . . . and complies with [s]ection 382 of the Code of Civil Procedure." (Bus. & Prof. Code, § 17203.) Recently, in *In re Tobacco II Cases* (2009) 46 Cal.4th 298, 324 [93 Cal.Rptr.3d 559, 207 P.3d 20],[5] the Supreme Court held in the UCL class action context, the "injury in fact" standing requirement imposed by Proposition 64 applies only to the class representative and not to "absent class members in a UCL class action *where class requirements have otherwise been found to exist.*" (Italics added.) UCL relief is available on a class basis "without individualized proof of deception, reliance and injury. [Citations.]" (46 Cal.4th at p. 320.)

Relying upon *In re Tobacco II Cases, supra*, 46 Cal.4th 298, and *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282 [119 Cal.Rptr.2d 190] (*Massachusetts Mutual*), Kaldenbach argues reversal is required because the trial court improperly premised its order denying class certification on the complexities of establishing each absent class member's reliance on the representations made and their injury. But that was only one of the individualized issues the court found predominated and could not be proven on a classwide basis. As we have already noted, we affirm the order denying class certification if *any* of the trial court's stated reasons are sufficient to justify the order. (*Lebrilla, supra*, 119 Cal.App.4th at pp. 1074–1075; *Caro, supra*, 18 Cal.App.4th at pp. 655–656.) There were myriad other individualized issues the court found to predominate, including whether any given agent took Mutual's training, read its manuals, and routinely followed the training and materials; and what materials, disclosures, representations, and explanations were given to any given purchaser. These individualized issues go not to the injury suffered by a purchaser, but to whether there was in fact an unfair business practice by Mutual. Neither *In re Tobacco II Cases, supra*, 46 Cal.4th 298, nor *Massachusetts Mutual, supra*, 97 Cal.App.4th 1282, compels a different result.

In *Massachusetts Mutual*, the trial court certified a class of over 33,000 persons who over 15 years bought "vanishing premium" life insurance

---

[5] We invited the parties to submit supplemental letter briefs addressing *In re Tobacco II Cases, supra*, 46 Cal.4th 298.

products in an action asserting violations of the UCL. (*Massachusetts Mutual, supra,* 97 Cal.App.4th at p. 1286.) Plaintiffs alleged, and had evidence supporting their claim, that at the time they purchased their vanishing premium policies the insurer had already developed plans to " 'ratchet down' " the discretionary dividend it was paying on policies and the insurer failed to disclose to purchasers or its agents that it did not intend to maintain its current high discretionary dividend rate utilized by sales agents in sales presentations. (*Id.* at pp. 1286, 1291.) On appeal, the insurer contended the claims were not suitable for class treatment because there must be individualized showing of the representation each class member received. The appellate court concluded the trial court had not abused its discretion by granting class certification because the UCL did not require that plaintiffs "present individual proof that each class member relied on particular representations made by [the insurer] or its agents." (97 Cal.App.4th at p. 1286.) "Rather, . . . the power to impose a remedy under the UCL will arise whenever a defendant's business practice is likely to deceive consumers." (*Id.* at p. 1291.)

In *In re Tobacco II Cases, supra,* 46 Cal.4th 298, plaintiffs alleged violations of the UCL based on defendant tobacco companies' "deceptive advertising and misleading statements [to the public] about the addictive nature of nicotine and the relationship between tobacco use and disease." (46 Cal.4th at pp. 306, 307–308, fn. 2.) After having previously granted class certification, in the wake of Proposition 64, the trial court reversed course and decertified the class concluding each absent class member would have to establish his or her injury and therefore significant questions had arisen " 'undermining the purported commonality among the class members, such as whether each class member was exposed to [d]efendants' alleged false statements and whether each member purchased cigarettes "as a result" of the false statements. Clearly . . . individual issues predominate, making class treatment unmanageable and inefficient.' " (46 Cal.4th at p. 311.) The Supreme Court reversed, concluding individualized proof of injury to absent class members in a UCL action was not required. (*Id.* at pp. 320, 324.)

But both *In re Tobacco II Cases* and *Massachusetts Mutual* involved identical misrepresentations and/or nondisclosures by the defendants made to the entire class. *In re Tobacco II Cases* targeted the tobacco industry's deceptive advertisements and statements disseminated to the public about the health effects of tobacco use. *Massachusetts Mutual* concerned the insurer's failure to disclose to policy purchasers and its agents its plan to decrease its discretionary dividend. In other words, there was no issue about the defendants' uniform business practices giving rise to the UCL claim.

But here there is no such uniformity. Although Kaldenbach claimed Mutual's presentations relating to ALP's were uniform and that it utilized

standardized training methods, materials, and scripts to which agents were required to adhere, the evidence showed the opposite. Mutual's policies were sold by independent agents, and during the class period, they were not required to attend training or utilize any given sales materials. Agents were not required to adhere to a scripted sales presentation. Indeed Meyerson, who sold Kaldenbach his policy, testified at his deposition he did not use a scripted sales presentation or any training materials in making the sale to Kaldenbach.

Thus, separate from whether any individual purchaser relied on alleged misrepresentations, or suffered injury as a result, here the determination of what business practices were allegedly unfair turns on individual issues. The trial court could properly conclude there was no showing of uniform conduct likely to mislead the entire class, and the viability of a UCL claim would turn on inquiry into the practices employed by any given independent agent—such as whether the agent involved in any given transaction took Mutual's training and read Mutual's manuals or used the training and materials in sales presentations, and what materials, disclosures, representations, and explanations were given to any given purchaser. The trial court did not abuse its discretion in concluding those issues predominated and could not be proven on a classwide basis.

*Common Law Fraud and Concealment Causes of Action*

Kaldenbach's complaint also contained common law causes of action for fraud and concealment. On appeal, he argues both were appropriate for class certification. The trial court did not abuse its discretion in concluding commonality was lacking.

Kaldenbach does not address his fraud cause of action as distinct from his concealment cause of action. The elements of fraud are: " '(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981].) More specifically, the elements of a cause of action for fraud based on concealment are: " '(1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage. [Citation.]' [Citation.]" (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 665–666 [51 Cal.Rptr.2d 907].)

Kaldenbach complains the court erroneously denied class certification of his concealment cause of action based on the merits of the cause of action—specifically, the court doubted Kaldenbach could prove a duty to disclose information was owed by Mutual to the class. But the court merely speculated on the duty issue, specifically acknowledging it could not deny class certification for that reason. In its ruling, the court outlined the numerous issues that had to be proven on an individual basis, and those issues pertained to all causes of action, not just the UCL cause of action.

■ Kaldenbach relies on *Occidental Land, Inc. v. Superior Court* (1976) 18 Cal.3d 355, 363 [134 Cal.Rptr. 388, 556 P.2d 750] (*Occidental Land*), and *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 814 [94 Cal.Rptr. 796, 484 P.2d 964] (*Vasquez*), in support of his contention his fraud and concealment causes of action could be proven on a classwide basis. Those cases held that "*when the same material misrepresentations have actually been communicated to each member of a class*, an inference of reliance arises as to the entire class. (*Vasquez, supra*, 4 Cal.3d at p. 814 & fn. 9; *Occidental Land, supra*, 18 Cal.3d at pp. 358, 359, 363.)" (*Mirkin v. Wasserman* (1993) 5 Cal.4th 1082, 1095 [23 Cal.Rptr.2d 101, 858 P.2d 568].)

■ Kaldenbach contends he is entitled an "inference of injury" and thus class certification was appropriate. But the *Vasquez/Occidental Land* class injury inference does not come into play absent evidence of uniform material misrepresentations having been actually made to class members. Here, the evidence indicates there were not common representations or omissions. Mutual's training materials and methods were not uniform, there was no requirement insurance agents provide any written materials or illustrations to purchasers during a sales presentation, agents were not required to take Mutual's training or to utilize any particular sales method or materials in their sales presentations, and agents were free to ignore the training and written materials. Mutual had no control over what a particular independent agent would illustrate for a prospective purchaser, as the agent could rely on numerous variables including age, risk, motives, coverage, and desired premium amount. Thus, the evidence supports the trial court's conclusion there were significant individual issues as to whether there were in fact any misrepresentations, omissions, or nondisclosures made to individual purchasers. Accordingly, we cannot say the trial court abused its discretion by denying class certification.

## V

## DISPOSITION

The order is affirmed. The Respondents are awarded their costs on appeal.

Aronson, J., and Fybel, J., concurred.

On October 26, 2009, the opinion was modifided to read as printed above.