[No. B216742. Second Dist., Div. Three. July 13, 2011.]

PAULINE FAIRBANKS et al., Plaintiffs and Appellants, v.
FARMERS NEW WORLD LIFE INSURANCE COMPANY et al.,
Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*This opinion is certified for publication with the exception of part 5 of the Discussion.

## COUNSEL

Law Office of Robert S. Gerstein, Robert S. Gerstein; The Marks Law Firm, Scott A. Marks; Loyola Law School, John Theodore Nockleby; Girardi Keese and John A. Girardi for Plaintiffs and Appellants.

Fulbright & Jaworski, Peter H. Mason, Richard R. Mainland, Joshua D. Lichtman and Eric A. Herzog for Defendants and Respondents.

## OPINION

**CROSKEY, J.**—Plaintiffs and appellants Pauline Fairbanks and Michael Cobb appeal from an order denying their motion for class certification in their action against Farmers New World Life Insurance Company and Farmers Group, Inc. (collectively, Farmers). Plaintiffs' action alleges violations of the unfair competition law (Bus. & Prof. Code, § 17200; henceforth UCL)[1] in connection with Farmers's marketing and sale of universal life insurance policies. The trial court denied the motion for class certification on the basis that common issues did not prevail, specifically concluding that Farmers did not use a common marketing strategy with respect to the policies. As such, the trial court concluded that whether any proposed class member actually heard any alleged misrepresentation was an issue incapable of common proof, requiring denial of the class certification motion.

As substantial evidence supports the trial court's factual finding, we affirm. On appeal, plaintiffs argue that the order denying class certification can be

---

[1] Business and Professions Code section 17200 defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice." Each of these three prongs—unlawful, unfair, or fraudulent—implicates a different legal standard, although a single practice may simultaneously violate more than one prong of the UCL.

reversed on bases other than those argued to the trial court below. Specifically, although they argued before the trial court that a class action should be certified on the basis of the common marketing of the policies *in combination with* certain other allegedly improper practices of Farmers, plaintiffs now argue that the other allegedly improper practices *standing alone* support class certification. As this argument was not made before the trial court, we need not reach or consider it.[2]

## *FACTUAL AND PROCEDURAL BACKGROUND*

As we will discuss, the theory on which plaintiffs ultimately sought class certification is key to our resolution of this appeal. Plaintiffs took a very broad brush approach in their complaint, alleging innumerable wrongdoings of Farmers in connection with the universal life insurance policies at issue in this case. Similarly, the evidence submitted by plaintiffs in support of their class certification motion suggested a myriad of improprieties. However, plaintiffs' briefing in support of the class certification motion narrowed plaintiffs' theory of the case to a manageable handful of arguments. Having failed in obtaining certification on the narrow theory on which certification was actually sought, plaintiffs, on appeal, attempt to broadly redefine their theory of the case, relying again on the allegations of their complaint and the evidence submitted, even when those allegations and supporting evidence were not presented to the trial court as a basis for class certification. This circumstance presents a problem on appeal. Plaintiffs cannot argue now that the trial court erred in failing to rule on a theory plaintiffs failed to pursue before that court.

### 1. *Farmers's Universal Life Insurance*

Before we discuss the particular policies at issue, a brief introduction to the topic of life insurance is helpful. The simplest type of life insurance is term insurance. Term insurance provides a level death benefit, for a set term of years, in exchange for the payment of a fixed premium. If the policyholder outlives the term of the policy, there is no payout. As a general rule, the annual cost of insurance (also known as the risk rate) increases as a person ages. Thus, if a person were to buy a series of annual life insurance policies, that person could anticipate paying a higher premium each year. Term insurance allows the payment of equal premiums over the set term; the policyholder "overpays" for insurance in the earlier years and "underpays" in

---

[2] We express no opinion on whether a class could or should be certified based on allegations of non-marketing-related allegedly improper practices standing alone. On remand, the trial court may exercise its discretion to consider any subsequent motion for class certification, should plaintiffs choose to proceed on an alternative basis.

later years. Both the overpayments and the interest the insurer earns on the overpayments offset the subsequent underpayments.[3]

We are concerned in this case with an insurance product known as universal life insurance. With universal life, the policyholder's premium payments are paid into the policyholder's accumulation account. The insurance company credits the accumulation account with interest on its balance, and deducts from the accumulation account the annual cost of insurance. The purported advantages of universal life, over term insurance, include (a) premium payments may be skipped, as long as there is a sufficient balance in the accumulation account to cover the cost of insurance; (b) the death benefit can be increased or decreased without writing a new policy; (c) the money in the accumulation account can be withdrawn as needed; (d) interest accrues on the accumulation account on a tax-deferred basis; and (e) if desired, the policyholder can keep the policy to maturity (age 95 or 100), and receive its cash value at that time.

There are also two different death benefits possible with a universal life policy. One, like term insurance, is a level death benefit. The other, which is another purported advantage of universal life, is an increasing death benefit. Consider a hypothetical policy value of $500,000. When a universal life policyholder chooses an *increasing death benefit*, the amount paid the beneficiary at the policyholder's death is the set policy value ($500,000) *plus* the amount then in the policyholder's accumulation account. In contrast, when a universal life policyholder with a *level death benefit* dies, the accumulation account partially offsets the policy value, and the insurer is therefore required to pay only the difference between the accumulation account and the policy value ($500,000). Put another way, the total policy benefit would be $500,000, *including* the amount in the accumulation account.

This distinction between death benefits is important when considering the costs of insurance deducted annually from the policyholder's accumulation account. As discussed above, the cost of insurance generally increases as a policyholder ages. Thus, with an increasing death benefit, the cost of insurance deducted from the account will increase each year; that is, the cost to provide the policyholder with a hypothetical $500,000 in coverage goes up as the policyholder ages. With a level death benefit, however, as long as the

---

[3] An alternative to term insurance is whole life insurance. As the name suggests, whole life insurance is not limited to a specific term, but provides coverage for the policyholder's lifetime—with a cash value payout (generally equal to the death benefit) when the policy matures at a late age. As with term insurance, whole life insurance provides a set death benefit in exchange for the payment of a fixed premium. In this case, plaintiffs compare Farmers's universal life policies with term insurance, not whole life insurance.

balance in the accumulation account continues to increase (with premium payments and accrued interest), the amount of insurance which needs to be purchased each year decreases ($500,000 less the balance of the accumulation account). Thus, the increase in insurance costs that comes with age is at least partially offset by a decrease in the amount of insurance which needs to be purchased.[4]

We are concerned in this case with two types of universal life insurance sold by Farmers, both of which permitted the policyholder to choose between level and increasing death benefits. These are Farmers's universal life policy (FUL) and Farmers's flexible universal life policy (FFUL). The bulk of the evidence in this case pertained to the FFUL, which contained another purported advantage over term insurance: the premium was set by the policyholder, and could be changed at any time. Within broad limits, the policyholder could pay as much, or as little, as the policyholder wanted.[5] The policy would remain in effect regardless of the amount of premium paid as long as there was a sufficient balance in the accumulation account to pay the cost of insurance. In contrast, the premium for the FUL was set by Farmers, and could be changed by Farmers every five years. With both the FUL and FFUL, Farmers set the interest rate to be credited to the accumulation account, with a guaranteed minimum that the rate would not sink below. Farmers also set the risk rate for both policies, determining the insurance charges that would be withdrawn, with a guaranteed maximum set of risk rates the rates would not increase above. With respect to the FFUL, the maximum premium that could be paid was the amount of premium necessary to guarantee the selected death benefit at the guaranteed minimum interest and maximum risk rates.[6]

---

[4] Because interest accumulates in a universal life accumulation account on a tax-deferred basis, it is easy to see why someone would choose to purchase a universal life policy with a very small level death benefit, fund the accumulation account with an amount *in excess of* the death benefit, and simply use the accumulation account as a way to earn tax-deferred interest. In order to prevent this scenario, the IRS requires that the amount in an accumulation account *never* exceed the amount of the death benefit. (Indeed, the amount of the death benefit must exceed the amount of the accumulation account by a set percentage, which is determined by the age of the policyholder.) In Farmers's universal life policies, it assured compliance with the IRS requirements by raising the death benefit on level death benefit policies as necessary. As a result, there would always be an insurance charge deducted from the accumulation account, even when the accumulation account exceeded the original level death benefit of the policy.

[5] There was a minimum premium set for the first year. We will discuss the maximum premium below.

[6] This maximum was set in order to maintain favorable tax treatment for the interest accumulated in the accumulation account. If any premiums were paid in excess of the maximum amount necessary to guarantee the full insurance benefit in the "worst case scenario" of interest and risk rates, the universal life policy would become an investment, rather than insurance, for tax purposes.

The FFUL provided that it would mature when the policyholder reached age 95; the FUL would mature at age 100. However, a universal life policy remains in effect only as long as there is sufficient money in the accumulation account to pay the costs of insurance. As discussed above, the cost of insurance is generally lower when one is young and increases as one ages. Plaintiffs therefore reason that, in order for a universal life policy to remain in effect in the later years of one's life, it is generally necessary to either (a) build up the accumulation account with large premium payments in the early policy years or (b) pay substantially increased premiums when one is older.[7] Moreover, the actual premium amounts that will keep the universal life policy in effect cannot be determined when the policy is purchased, as interest and risk rates are not predictable (other than that they will be within the extreme limits set by the policy). The fact that a universal life policy requires high premium payments in early years to remain in effect in later years, particularly when interest rates are low, is at the heart of plaintiffs' case. Plaintiffs allege that Farmers designed and marketed its FUL and FFUL policies in such a way that the premiums paid would be inadequate to keep the policies in effect until maturity, resulting in the underfunding of the policies, and their eventual lapse.

When marketing FUL or FFUL policies to prospective purchasers, Farmers agents often used computer-generated illustrations, which would—for any death benefit and premium[8] input—set forth the annual balance in the accumulation account at several different interest rates. The illustrations would always include the results for the worst case scenario—that is, the lowest guaranteed interest rate and the highest risk rate—but would also include rates that showed a more favorable result for the policyholder. Plaintiffs believe these illustrations were misleading in a number of ways. Perhaps most significantly, plaintiffs allege that, in many cases, the illustrations were not printed all the way to the policy's maturity. In these illustrations, the printout would stop at an age where there would be a high balance in the accumulation account, and would not show that, in subsequent years, as the costs of insurance increased, the balance in the accumulation account would be quickly reduced to zero and the policy would lapse.

Policyholders were sent annual statements from Farmers, which set forth the balance in their accumulation account, and the then applicable interest rate and risk charges. Although there was language in the annual statements indicating how long the policy would remain in force under current rates,

---

[7] Plaintiffs overlook a third option: reducing the policy value, or switching from an increasing death benefit to a level one.

[8] As the premiums were set by Farmers with respect to the FUL policies, this was not a variable in the illustrations used to market those policies.

plaintiffs believe the annual statements did not properly warn policyholders of underfunding and the risk of lapse.

### 2. Allegations of the Complaint

The operative complaint is the fourth amended complaint.[9] In it, plaintiffs allege causes of action for violation of the UCL, negligent misrepresentation, and fraudulent inducement. They seek to allege their causes of action on behalf of everyone in the United States who purchased an FFUL or FUL policy over a 12-year period.

The complaint set forth a litany of alleged facts misrepresented or concealed from policyholders, including, but not limited to, the following: (a) Farmers marketed the policies as permanent insurance, but the policies would actually lapse before maturity; (b) computer printout sales illustrations used by Farmers's agents were ambiguous and contained inadequate disclaimers and definitions; (c) the illustrations hid relevant information and were based on unrealistic assumptions; (d) Farmers encouraged setting the premium for FFUL policies no higher than a "target" rate, by its commission structure; however, policies would lapse when only the target premium was paid; (e) certain terms in the sales materials or insurance policies were not defined; (f) Farmers failed to disclose that all FFUL policies where anything less than the maximum premium was paid would self-destruct; (g) allowing the policyholder to set the FFUL premium after the first year made the policies likely to self-destruct; (h) Farmers failed to disclose that it set its interest rates based on the rates its competitors were using; (i) Farmers failed to disclose that it lowered interest rates paid existing policyholders while it increased "teaser" interest rates for new customers; (j) Farmers solicited customers with a fraudulent sales pitch which stated that, at some point, the policyholders' obligation to pay premiums would vanish; (k) Farmers knew or should have known that interest rates would be less than those it projected; (l) Farmers failed to disclose the nature and extent of the commissions it paid its agents; (m) Farmers failed to disclose that much of the premium payments made would pay for the insurance, commissions, and administrative charges, and would therefore not remain in the accumulation account earning interest; and (n) Farmers failed to disclose that it could change rates for its own benefit.

Additionally, plaintiffs alleged that many practices of Farmers constituted unfair business practices. These included, but were not limited to: (o) The FUL policies were "inherently defective" as their premiums were set on the premise of an 11.5 percent interest rate, while Farmers did not have a good

---

[9] The fourth amended complaint was actually filed during briefing on the motion for class certification. The parties agree, however, that it may be considered to be the operative pleading with respect to the motion for class certification.

faith belief that rate would continue to be paid; (p) Farmers encouraged the replacement of existing policies with new policies, which encouragement did not consider whether replacement was in the policyholders' best interests; (q) universal life insurance is, in truth, simply term insurance, but is much more expensive for the policyholder and contains much higher profit margins for Farmers; (r) the policies were "inherently fraudulent by allowing [Farmers] to commit actions behind closed doors, which materially affected the policies"; and (s) the policies were designed to pay Farmers a profit before any interest was paid to the policyholders.

### 3. Class Certification Motion

When plaintiffs moved for class certification, they considerably narrowed the bases on which they sought relief. That is, they argued that common issues of fact existed only with respect to several issues related to a single unified theory.

Preliminarily, we note that plaintiffs' motion for class certification sought relief for fraudulent misrepresentations and concealments. Thus, to the extent the motion for class certification addressed the UCL, it was based on allegations of fraudulent business practices, not unfair ones. On appeal, however, plaintiffs now assert that the trial court erred in failing to consider its arguments that a class should be certified with respect to the "unfair" business practices prong of the UCL. Farmers correctly responds that this argument was waived, as plaintiffs failed to pursue unfair business practices in its motion for class certification.[10]

---

[10] In their reply brief on appeal, plaintiffs state that they addressed the unfairness prong of the UCL in three places in their motion for class certification. This is a misstatement of the record. Plaintiffs first rely on language appearing on pages 127 to 128 of the appellants' appendix; this language is *not* a discussion of the unfairness prong of the UCL, but simply states that a nationwide class should be certified because "the cause of action for unfair competition under Business and Professions Code section 17200," and all other causes of action, originated in California. Second, plaintiffs rely on language on page 131 of the appellants' appendix, which discusses a case holding that application of California's consumer protection laws will protect the interests of nationwide consumers; the reference is simply that the case cited found the allegations therein sufficient to support a cause of action "for an unfair business practice." Plaintiffs' third citation is to page 144 of the appellants' appendix, which does not mention either the UCL or unfairness. Perhaps plaintiffs intended to cite page 146 of the appellants' appendix, which, like the other pages on which plaintiffs rely, mentions the UCL in general, but says nothing at all regarding the "unfairness" prong. These three references *in no way* amount to an argument that a class should be certified with respect to the allegations that Farmers violated the unfairness prong of the UCL because the factual and legal issues raised by those allegations are subject to common proof. Plaintiffs never set forth the legal standard to be applied for an unfairness challenge, nor did they set forth the common facts on which they would rely to meet that standard.

In their motion for class certification, plaintiffs pursued the following arguments: (a) both the FFUL and FUL were marketed as "permanent" insurance, when they were not permanent; (b) the FFUL policies were systematically underfunded; agents were encouraged to set inadequate premiums by the commission structure and computerized premium-suggesting tools; (c) the FUL policies were also systematically underfunded; premiums were set by Farmers based on unrealistically high projections for interest rates; and (d) both policies were deceptively marketed in several respects— they were marketed as permanent, the illustrations were misleading, policyholders were falsely told interest rates would be set to be competitive, some policies were falsely marketed with vanishing premiums, and some were marketed as replacements which were not in the policyholders' best interests. We note that these were not four separate bases for class relief, but part of one overarching allegedly fraudulent scheme. As plaintiffs explained, "[L]iability depends, not on the particular facts underlying each insured's claim, but on the combination of illustration, policy design, annual statements[,] agent training, and marketing materials, all emanating from [Farmers] in Los Angeles, and all directed at persuading policyholders to buy underfunded term insurance policies in the belief that they would offer the kind of permanent protection whole life policies provide at a lower cost [citations]."

Plaintiffs argued that proof of this fraudulent scheme could be established by common, rather than individual, proof, based on a combination of common policy language, common language in annual policyholder statements, and a common marketing scheme.

Plaintiffs' specific argument regarding the underfunding of FFUL policies depended in large part on the existence of a "target" premium—for all premiums up to the target premium, agents received a commission of 50 percent, but for every premium dollar in excess of the target premium, agents received only a 3 percent commission. Plaintiffs took the position that this commission structure encouraged agents to set the premiums at or below target, and that if a policyholder wanted to pay more than the target, the agent would instead suggest raising the face amount of the policy (which would therefore increase the target, and the agent's commission). Plaintiffs also noted that Farmers's computerized rate-setting program would inform agents of the minimum and target premiums, thus suggesting that the premium be set between these two numbers, and no higher.

Plaintiffs' argument regarding the underfunding of the FUL policies was more direct. As Farmers set the premiums on these policies, it was solely within Farmers's control to establish initial premiums high enough to accrue sufficient interest so that the policies would be on track to last until maturity.

Farmers set the premiums based on a presumed 11.5 percent interest rate, which plaintiffs argued was unrealistically high, and would result in the policies lapsing.

Plaintiffs submitted in excess of 1,200 pages of documentation in support of the motion. While plaintiffs relied in part on the language of the policies[11] and some expert declarations, the great bulk of plaintiffs' evidence was intended to establish that Farmers's agents were trained to sell the policies in a uniform manner, using scripts that Farmers wrote, brochures that Farmers printed, and computer illustrations that Farmers generated. This common marketing scheme, according to plaintiffs, was designed to misrepresent the facts (including underfunding) and conceal the risks (including the risk of lapse) from policyholders.

We note, however, that plaintiffs submitted evidence beyond that relied upon by them in their motion for class certification. For example, they presented evidence that the FUL policies contain a minimal, if any, surcharge on policy payments if policyholders make their payments semiannually or monthly, but a 20 percent surcharge if payments are made quarterly. But, plaintiffs did not seek to certify a class (or subclass) of all FUL policyholders who made quarterly payments and were assessed this charge. Similarly, plaintiffs submitted an internal Farmers memorandum suggesting that, to increase FUL sales, Farmers should increase the interest rate paid and offset the expense by increasing risk rates. Plaintiffs did not seek to certify a class (or subclass) of all FUL policyholders whose risk rates were increased to offset a higher interest rate.[12]

### 4. Farmers's Opposition to the Class Certification Motion

In opposition to the class certification motion, defendants argued that plaintiffs' theory of relief would require independent, not common, proof. First, Farmers argued that, even if the policies were represented as "permanent," the materiality of such a representation would vary by policyholder. In this respect, Farmers introduced the testimony of an expert in risk management and insurance who testified that many, if not most, owners of universal

---

[11] There is no language in the policies expressly stating the policies provide "permanent" insurance. Instead, plaintiffs rely on language such as this introductory quote on the first page of the FFUL policy: "This policy is a legal contract between you and us. READ YOUR POLICY CAREFULLY. This LIFE INSURANCE policy provides death protection *for as long as you live during the period of coverage.* That period, the premium payment details, and other policy data, are shown in the Policy Specifications on the last page of this policy." (Italics added.)

[12] Indeed, there is no evidence that this proposal was actually put into effect. Plaintiffs relied on the memorandum only to illustrate what they claimed was the cavalier way in which Farmers treated its policyholders, not for the actual proposal set forth therein.

life policies do not intend or expect the policies to stay in force until maturity or have no expectation one way or the other on this point. This testimony was confirmed by a survey of 500 FFUL policyholders which had been commissioned by plaintiffs' counsel earlier in the case.[13] When asked if they would have purchased their FFUL policies if Farmers had disclosed to them that their premiums were *not* guaranteed to keep their policies in force, 47.4 percent of survey respondents said that they would have (while 46.2 percent said they would not have).[14] Farmers argued that, as roughly half of the FFUL policyholders would have bought the policy even if they had been told it was not permanent insurance, the materiality of any misrepresentation of permanence was clearly not subject to classwide proof.

As to the issue of underfunding, defendants asserted that it is impossible to argue that a policy is "underfunded" in the abstract; a policy can only be underfunded if it lacks the funds to meet the specific policyholder's needs at any given time. Defendants argued that it is impossible to know, without considering each policyholder separately, how long each one intended to keep the policy, how much the policyholder could afford to pay, whether the policyholder expected to pay increased premiums in the future, whether the policyholder intended to cash out the policy at retirement, and so forth. In any event, Farmers argued, as each FFUL policyholder set his or her own premium, the issue of underfunding of the FFUL policies was, of necessity, not capable of common proof. As to plaintiffs' argument that the "target" premium commission structure encouraged the setting of premiums at or below target, Farmers introduced evidence that while plaintiffs' description of the commission structure was accurate, it did not result in premiums being set below target. Indeed, Farmers's evidence indicated that over 173,000 FFUL policies, 26 percent of the total FFUL policies at issue, had premiums set by the policyholder which *exceeded* the target premium.[15]

---

[13] In reply to Farmers's opposition to the class certification motion, plaintiffs submitted an expert declaration indicating that their own survey was "seriously flawed." As plaintiffs had conducted the survey and had previously relied on it, the trial court did not err in concluding they could not now disclaim it.

[14] At her deposition, Fairbanks, who was a former Farmers agent, agreed that some people may not want to keep their policies to maturity.

[15] In what is perhaps an illustration of the proposition that statistics can be manipulated to support competing conclusions, plaintiffs responded that in over 100,000 of the 173,000 policies in which the premium was over target, the premium exceeded the target by only $100 or less. Without knowing whether the "premium" in question is an annual or a monthly premium, it is difficult to determine whether exceeding it by $100 is a significant sum (rather than, for example, simply rounding up). A different approach to the data indicates that, for over 80,000 policies, the premium paid was more than 25 percent over the target premium—clearly a substantial increase. Indeed, nearly 14,000 FFUL policyholders paid the maximum permissible premium. Clearly, the 14,000 policyholders who paid the maximum premium could not possibly be members of the class; their policies were not underfunded under any standard. As to the approximately 65,000 other policyholders who set their premiums more than 25 percent

As to underfunding of the FUL policies, Farmers's argument was addressed more to the merits than to the issue of class certification. Specifically, Farmers argued that, regardless of language in the policies that could be read to the contrary, the policies simply *would not lapse* if the policyholder paid the premiums set by Farmers, even if the accumulation account was reduced to zero. Similarly, while Farmers agreed that it initially set the FUL premiums based on a presumed 11.5 percent credited interest rate, the policies would still retain a positive balance throughout the policy term at lower rates.

Finally, as to the allegations of a misleading marketing plan, Farmers submitted substantial documentation indicating that its marketing was not subject to common proof. All purchasers of FUL or FFUL policies, except those who, like Fairbanks, were Farmers agents themselves, purchased their policies from Farmers agents. The FUL and FFUL policies were not sold by television commercials, magazine advertisements, or some other marketing campaign directed to the general public. Instead, each FUL or FFUL policy was sold as the result of an individual sales presentation from the agent to the prospective policyholder. While Farmers created brochures setting forth some of the advantages of the policies, the brochures did not stand alone, and, in any event, agents were not required to use them.

Farmers also disputed plaintiffs' evidence regarding sales scripts, and introduced testimony from various agents and supervisors to the effect that no scripts were prepared. They testified that the agents themselves were not uniformly trained as to the policies, and that, although Farmers prepared hypothetical sales presentations as training tools, Farmers neither expected nor mandated that these presentations be used when talking to potential policyholders.[16] Instead, Farmers taught its agents to tailor their presentations to each individual potential policyholder's objectives.

Farmers also introduced evidence that its agents were not required to use computer-generated illustrations in selling the policies and did not always do so; that when they used the illustrations, agents input different data and printed out different scenarios; and that agents did not explain the illustrations

---

over the target premium, plaintiffs would have a very difficult time establishing that their policies were underfunded due to Farmers's alleged plan to set all premiums at or below target. Together, these policyholders account for 80,000 of the 665,002 FFUL policies potentially at issue in this case, some 12 percent of the FFUL class.

[16] Plaintiffs attached one such sample presentation to their opening brief in this case. We note that this particular dialogue does *not* state that the policy will last until maturity at any particular premium rate; the hypothetical policyholder in the example increases premium contributions during the policy term and makes withdrawals for retirement at age 65. We are somewhat puzzled as to why plaintiffs put so much weight on this purported "script," which does not contain the key misrepresentation on which plaintiffs rely—that the policy is permanent at any premium paid.

in a uniform manner. To the extent the agents sold FUL or FFUL policies as replacements for other policies, they indicated that they did so only after considering the individual policyholder's situation and determining whether it was in the policyholder's best interest; the agents denied any Farmers plan encouraging the indiscriminate replacement of policies. Farmers also submitted deposition testimony from plaintiffs' own expert to the effect that sometimes a replacement is good for the policyholder and that each replacement must be evaluated on its own facts.

### 5. *Plaintiffs' Reply and Further Briefing*

In their reply, plaintiffs explained the issue at the heart of the certification motion as follows: "Fundamentally, the problem is that Farmers sold systematically underfunded universal life policies as 'permanent insurance,' when in fact they could not provide the life-long security which policyholders expect from permanent life insurance." Plaintiffs again argued that the marketing of the policies was uniform, and supported their reply with an additional 3,000 pages of documents attempting to demonstrate that Farmers agents learned about the policies from uniform scripts, and they, in turn, told their prospective policyholders about the policies in a uniform manner.[17]

Farmers then responded with a surreply, and additional evidence that the marketing was not uniform.[18] The evidence included further sales agent deposition excerpts indicating that at least some agents would tell FFUL policyholders when the premium amount they were considering would not be sufficient to carry the policy to maturity, and others would recommend FFUL policyholders switch to a level death benefit at age 50 because the risk charges are "quite a bit more in the later years on the increasing [death benefit] option." Plaintiffs then submitted further exhibits in support of the motion.[19] Subsequently, Farmers submitted a supplemental response.

---

[17] In the motion for class certification, plaintiffs had argued that some of the policies were sold on a vanishing premium theory. Farmers had responded that there was no way to determine which policyholders had been given such a sales presentation. In their reply, plaintiffs did not disagree with this; instead, they argued that the vanishing premium sales pitch was just "a particularly egregious example" of the underfunding problem with the policies. Plaintiffs do not explain how the fact that some policies may have been sold on a vanishing premium theory demonstrates that the marketing for the policies is subject to classwide proof. Indeed, it would seem to support the conclusion that different sales techniques were used for different prospective policyholders.

[18] Specifically, Farmers relied on deposition testimony from Fairbanks that, as an agent, she did not recall being instructed to use a sales script when presenting FFUL to a prospect, and she never did.

[19] The exhibits were submitted in support of plaintiffs' response to the surreply. Plaintiffs have not included their response to the surreply in the record on appeal.

Our review of this record establishes beyond dispute that the parties had ample opportunity to submit every argument and shred of evidence supporting their positions; without doubt, the motion for class certification was fully briefed.

### 6. *Hearing*

The hearing on the motion took place over several hearing dates over the course of several months. At the hearing, plaintiffs' counsel explained that plaintiffs' theory of the case was that Farmers failed to disclose the true risks of the policies. Plaintiffs' counsel argued that Farmers's argument that every sale was different did not matter because "this lawsuit, this civil action, does not arise for events that occur at the point of sale. [¶] What is important for the court to understand is that the focus and the core of this case is what takes place at the point of origin because Farmers designed the policy, designed the schedule, designed the marketing, and it is from that core of facts that each and every policyholder is affected from the misrepresentations."

### 7. *Order Denying Class Certification*

On April 9, 2009, the trial court denied certification. In considering the motion for class certification, the trial court found the proposed class ascertainable and sufficiently numerous. However, it concluded that predominant common questions of fact or law did not exist, thus defeating the community of interest element necessary for class certification.

The court considered the plaintiffs' argument that the language of the policies themselves was misleading. The court stated that the design of the policies was only relevant to the extent that (1) Farmers marketed the policies as permanent insurance; (2) the class members wanted permanent insurance; and (3) the class members relied on Farmers's representations of permanence.[20] While the court questioned whether the evidence demonstrated that Farmers marketed the policies as permanent, it concluded that the issue of

---

[20] When the trial court was considering the motion for class certification, our Supreme Court was considering, and had not yet decided, *In re Tobacco II Cases* (2009) 46 Cal.4th 298 [93 Cal.Rptr.3d 559, 207 P.3d 20] (*Tobacco II*). That case presented the issue of whether the newly adopted standing requirements of Business and Professions Code section 17204 (which require a plaintiff pursuing a UCL action to be a person "who has suffered injury in fact and has lost money or property as a result of the unfair competition") applied to every member of the class, or only the class representative. When the parties briefed the motion in this case, and when the trial court ruled on it, it was assumed that these requirements would apply to every member of the class. Subsequently, the Supreme Court's decision in *Tobacco II, supra*, 46 Cal.4th at page 306, would prove this assumption wrong. There is no real dispute in this case that the trial court erred to the extent it believed each member of the class would be required to show reliance on the misrepresentations.

whether the policies were marketed as permanent was, in fact, amenable to common proof. The court went on to conclude, however, that the issues of the desires of prospective class members and whether they relied on the representations were not so amenable. Specifically, in determining whether class member reliance was a common issue, the court concluded that the issue of what information was provided by Farmers to its agents could not be divorced from the issue of what information the agents told individual prospective insureds, and this latter determination was not subject to common proof.

There is an apparent contradiction in the trial court's order—the court first concluded that whether Farmers marketed its policies as permanent was amenable to common proof, but later concluded that the issue of which representations were conveyed to prospective policyholders was not. Having reviewed the court's order in detail, it appears that the court concluded that whether *marketing materials produced by Farmers* made representations of permanence was subject to common proof, but whether those materials were conveyed to prospective policyholders, or other representations of permanence were made, was not. This conclusion is supported by the findings of fact made by the trial court. The trial court discussed, at length, Farmers's evidence that any materials describing the policies as "permanent" insurance were not, in fact, uniformly provided to prospective insureds. The trial court found, based on Farmers's evidence, that agents "did not make standardized, uniform oral sales presentations by rote to all of their prospective FUL or FFUL purchasers," and that the agents "did not uniformly represent to prospective customers that the FUL or FFUL policies were 'permanent insurance.' " The court expressly stated, "[t]here is no evidence that the same material misrepresentations have actually been communicated to each member of the class." As such, the court could not possibly have concluded that the issue of whether the policies were marketed *to consumers* as permanent was amenable to common proof.

In short, the trial court concluded that common questions of fact and law do not predominate because, among other things: (1) the representations made to prospective policyholders were not common; and (2) whether any particular misrepresentation was material was also not common, as resolution of the issue would depend on the particular needs of the prospective policyholder.[21]

---

[21] The court also found that Fairbanks was not a typical class member, although it did not question Cobb's typicality. The court also found that, with one exception, plaintiffs' counsel could adequately handle the case. Specifically, the court found that Attorney David Sheller, whose conduct in this case we addressed in *Sheller v. Superior Court* (2008) 158 Cal.App.4th 1697 [71 Cal.Rptr.3d 207], would not be an adequate class representative. Attorney Sheller appealed from this portion of the court's order; he subsequently dismissed his appeal.

### 8. Postorder Proceedings

On May 12, 2009, plaintiffs filed an ex parte motion to vacate the order denying class certification, on the basis that *Tobacco II* was pending before the Supreme Court, and the trial court should therefore vacate its order and schedule the motion to be rebriefed once the Supreme Court decided *Tobacco II*. The motion was denied. On May 28, 2009, after *Tobacco II* had been decided, plaintiffs filed a second ex parte motion to vacate the order denying class certification. The trial court denied the motion on the basis that there was no emergency requiring ex parte relief; the court directed plaintiffs to file a noticed motion to vacate and set it for hearing. Plaintiffs declined to do so, and instead filed a notice of appeal.[22]

## ISSUES ON APPEAL

Having lost the motion for class certification on the basis on which it was brought, plaintiffs attempt to redefine their theory of the case on appeal. Thus, while plaintiffs concede that the "core" of their case is that the FFUL and FUL policies were sold as permanent insurance but were, in fact, underfunded, plaintiffs now attempt to revive arguments based on dozens of purported flaws in the policies as set forth in their expert declarations, and their cause of action based on the unfairness prong of the UCL. The problem is that none of this was argued as a basis for class certification. We decline to consider any of these arguments, which were not before the trial court when it ruled on the motion for class certification. Instead, we limit our consideration of whether the trial court erred in its ruling on the motion for class certification to the theory on which plaintiffs pursued class certification.

We acknowledge, as does Farmers, that the intervening opinion of the Supreme Court in *Tobacco II* renders immaterial the trial court's finding that the issue of reliance is not subject to common proof.[23] Thus, we consider whether the trial court's order may be upheld on any other basis. Plaintiffs argue that the order cannot be upheld on any basis, because the trial court erred, both in its application of the law and its resolution of the factual issues.

---

[22] In plaintiffs' reply brief on appeal, they state that they filed an application to vacate the order based on *Tobacco II*, "but the trial court failed to modify the order in any way." While this is technically correct, it overlooks the fact that plaintiff's application was filed on an ex parte basis, and that when the court denied it, it directed plaintiffs to proceed by a noticed motion.

[23] "Immaterial" is perhaps too strong a word. While reliance is irrelevant to plaintiffs' cause of action under the UCL, it would still be relevant to plaintiffs' causes of action for negligent misrepresentation and fraudulent inducement. However, as we will conclude the trial court did not err in concluding individual issues predominate on the key issues of what representations were made to class members and whether they were material, class certification was properly denied on all causes of action without consideration of the element of reliance.

We disagree, and will conclude that the trial court's order was well supported by substantial evidence, and is in accord with the law as set forth in similar cases.

## DISCUSSION

### 1. *Standard of Review*

■ " 'Code of Civil Procedure section 382 authorizes class suits in California when " 'the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court.' To obtain certification, a party must establish the existence of both an ascertainable class and a well-defined community of interest among the class members. [Citations.] The community of interest requirement involves three factors: '(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' [Citation.]" ' [Citation.] [¶] As the moving party, [plaintiffs] bore the burden of establishing the propriety of class certification. [Citation.] The trial court has great discretion with regard to class certification, and its decision will not be disturbed on appeal if it is supported by substantial evidence, unless it was based upon improper criteria or erroneous legal assumptions. [Citations.] [¶] Ordinarily, appellate review is not concerned with the trial court's reasoning but only with whether the result was correct or incorrect. [Citation.] But on appeal from the denial of class certification, we review the reasons given by the trial court for denial of class certification, and ignore any unexpressed grounds that might support denial. [Citation.] We may not reverse, however, simply because *some* of the court's reasoning was faulty, so long as *any* of the stated reasons are sufficient to justify the order." (*Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 843–844 [100 Cal.Rptr.3d 637] (*Kaldenbach*).)

### 2. *The Misrepresentations Were Not Common*

The class certification motion was based on plaintiffs' allegations of fraudulent business practices under the UCL and related common law causes of action. As the elements a plaintiff must prove to establish a fraudulent business practices cause of action under the UCL are more favorable to plaintiffs than those for common law fraudulent inducement and negligent misrepresentation (see *Tobacco II, supra,* 46 Cal.4th at p. 312) we limit our discussion to that cause of action.

■ " '[T]o state a claim under . . . the UCL . . . based on false advertising or promotional practices, "it is necessary only to show that

'members of the public are likely to be deceived.' " ' " (*Tobacco II, supra*, 46 Cal.4th at p. 312.) A representative plaintiff need not prove that members of the public were actually deceived by the practice, relied on the practice, or suffered damages. (*Pfizer Inc. v. Superior Court* (2010) 182 Cal.App.4th 622, 630 [105 Cal.Rptr.3d 795]; *Prata v. Superior Court* (2001) 91 Cal.App.4th 1128, 1144 [111 Cal.Rptr.2d 296].)

Nonetheless, a class action cannot proceed for a fraudulent business practice under the UCL when it cannot be established that the defendant engaged in uniform conduct likely to mislead the entire class. (*Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 942–943 [124 Cal.Rptr.3d 565], petn. for review filed June 1, 2011; *Kaldenbach, supra*, 178 Cal.App.4th at p. 850.) Specifically, when the class action is based on alleged misrepresentations, a class certification denial will be upheld when individual evidence will be required to determine whether the representations at issue were actually made to each member of the class. (*Knapp v. AT&T Wireless Services, Inc., supra*, 195 Cal.App.4th at pp. 944–945; *Kaldenbach, supra*, 178 Cal.App.4th at p. 850; see also *Pfizer Inc. v. Superior Court, supra*, 182 Cal.App.4th at p. 632.) " '[W]e do not understand the UCL to authorize an award for injunctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice.' " (*Knapp v. AT&T Wireless Services, Inc., supra*, 195 Cal.App.4th at p. 945; see also *Pfizer Inc. v. Superior Court, supra*, 182 Cal.App.4th at p. 632.)

The *Kaldenbach* case, which was issued while the instant case was pending on appeal, is virtually identical to this case. In *Kaldenbach*, the plaintiff brought suit against an insurance company, alleging violations of the UCL and common law fraud in connection with its sale of a universal life insurance policy by means of a vanishing premium sales tactic. In allegations very similar to the allegations in this case, Kaldenbach alleged that the insurance company defendant "provided computer illustrations and uniform sales materials to its agents that allowed [Kaldenbach's agent] to mislead him into believing a low cost of actual insurance combined with a very high rate of interest to be earned on the cash accumulation component of his premium payment would act in concert to generate adequate returns to cover the cost of his life insurance until the maturity date of the policy. But, he alleged, in reality (given a higher [risk rate] and declining interest rates), the policy could not perform in the manner represented to him. [The defendant] did not advise policy purchasers of the inherent risks in purchasing the [policy]." (*Kaldenbach, supra*, 178 Cal.App.4th at p. 836.) Kaldenbach sought to certify a class of all policyholders who had purchased the policy between certain dates, based on his evidence that all sales "were based on the same scripted sales presentations and computer illustrations that were misleading and omitted material facts." (*Id.* at p. 836.) Kaldenbach argued that all sales presentations were uniform in all respects, and agents were specifically

trained to conceal the risks of the policy. (*Id.* at p. 837.) The insurance company opposed class certification on the basis that the sales presentations were not uniform, and agents were, in fact, taught to tailor their presentations to each customer. (*Id.* at p. 839.) The trial court accepted the defendant's evidence and denied certification on the basis, inter alia, that there was no evidence that the sales presentations were actually common. (*Id.* at pp. 846–847.)

The *Kaldenbach* court affirmed, stating that there were myriad individualized issues, including "whether any given agent took [the defendant's] training, read its manuals, and routinely followed the training and materials; and what materials, disclosures, representations, and explanations were given to any given purchaser. These individualized issues go not to the injury suffered by a purchaser, but to whether there was in fact an unfair business practice by [the defendant]." (*Kaldenbach, supra,* 178 Cal.App.4th at p. 848.) The court stated: "[S]eparate from whether any individual purchaser relied on alleged misrepresentations, or suffered injury as a result, here the determination of what business practices were allegedly unfair turns on individual issues. The trial court could properly conclude there was no showing of uniform conduct likely to mislead the entire class, and the viability of a UCL claim would turn on inquiry into the practices employed by any given independent agent—such as whether the agent involved in any given transaction took [the defendant]'s training and read [the defendant]'s manuals or used the training and materials in sales presentations, and what materials, disclosures, representations, and explanations were given to any given purchaser. The trial court did not abuse its discretion in concluding those issues predominated and could not be proven on a classwide basis." (*Id.* at p. 850.)

As do plaintiffs in this case, Kaldenbach relied on *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282 [119 Cal.Rptr.2d 190] (*Massachusetts Mutual*), a case in which an order certifying a class of policyholders was upheld. In *Massachusetts Mutual,* however, the representations made to the class were common. (*Id.* at p. 1291.) The *Kaldenbach* court distinguished *Massachusetts Mutual* on the basis that *Massachusetts Mutual* "involved identical misrepresentations and/or nondisclosures by the defendants made to the entire class." (*Kaldenbach, supra,* 178 Cal.App.4th at p. 849.) The court explained, "In other words, there was no issue about the defendants' uniform business practices giving rise to the UCL claim." (*Ibid.*) In *Kaldenbach,* and in this case, there is such an issue.[24]

---

[24] Plaintiffs also rely on *McAdams v. Monier, Inc.* (2010) 182 Cal.App.4th 174 [105 Cal.Rptr.3d 704], a case in which the appellate court reversed a denial of class certification for a UCL claim. Yet in *McAdams,* the appellate court added an important "proviso" to its ruling: requiring that the members of the class, prior to purchasing the defendant's product "had to have been exposed" to the alleged common misrepresentation. (*Id.* at p. 179.)

■ *Kaldenbach* is indistinguishable from this case.[25] Because the trial court determined, based on substantial evidence, that the alleged misrepresentations of permanence were not commonly made to members of the class, the denial of class certification must be upheld. Plaintiffs argue that there was, in fact, a common marketing scheme generated from Farmers's headquarters; Farmers's evidence contradicted this, and the trial court found Farmers's evidence persuasive. In the absence of a common marketing scheme, the class action fails.

Plaintiffs argue, however, that the class action must be allowed to proceed because it cannot be disputed that the *language in the policies themselves* which suggests permanence is indisputably amenable to common proof. While policy language clearly is amenable to common proof, plaintiffs did not seek class certification on the basis that the policy language *standing alone* was misleading; they alleged that it was misleading in the context of the entire marketing scheme. Indeed, plaintiffs' motion for class certification stated, "[L]iability depends . . . on the *combination* of illustration, policy design, annual statements[,] agent training, and marketing materials, all emanating from [Farmers] in Los Angeles, and all directed at persuading policyholders to buy underfunded term insurance policies in the belief that they would offer the kind of permanent protection whole life policies provide at a lower cost [citations]." (Italics added.)

In any event, even if plaintiffs were permitted to now raise the argument that they seek to proceed with a class action based solely on the allegedly misleading language of the policies, it is still impossible to consider the language of the policies without considering the information conveyed by the Farmers agents in the process of selling them. (See *Knapp v. AT&T Wireless Services, Inc., supra,* 195 Cal.App.4th at p. 944 [individual issues prevailed when many of the class members may have received information explaining the allegedly concealed fact].) Plaintiffs are implicitly aware of this; their opening brief identifies a policy reference which is allegedly improper "[w]ithout further explanation"; Farmers's evidence is that such further explanations were provided to many members of the prospective class, and

---

[25] Plaintiffs attempt to distinguish *Kaldenbach* on the basis that the agents in *Kaldenbach* were independent agents selling insurance for different companies, while Farmers's agents are "captive" agents who could not place insurance with any other company. In our view, that distinction is irrelevant. Farmers introduced evidence that, even though its agents were captive, they were not uniformly trained on the FUL and FFUL policies, and were not required to sell the policies in any particular manner. Thus, the individual issues of fact existing in *Kaldenbach* are equally present here. In the absence of a material basis on which to distinguish *Kaldenbach,* plaintiffs argue that *Kaldenbach* was wrongly decided, in that it required individual proof of *deception* in violation of established California law. We disagree. *Kaldenbach* simply held that an action alleging a fraudulent business practice cannot proceed as a class action when it cannot be established that the business practice was directed to the entire class in common.

the trial court accepted this evidence. Thus, plaintiffs cannot obtain a reversal of the denial of class certification on this basis.

### 3. *Materiality Is Likewise Not Subject to Common Proof*

While we uphold the trial court's ruling on the basis that whether misrepresentations were made is not subject to common proof, we further note that the issue of materiality is also not subject to common proof. To be actionable, a misrepresentation must be material. " 'A misrepresentation is judged to be "material" if "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question" . . . .' " (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 332 [120 Cal.Rptr.3d 741, 246 P.3d 877].)

In this case, we are concerned with alleged misrepresentations of policy permanence. The trial court found, on substantial evidence, that the materiality of such representation to any given policyholder is a matter of individual proof. While we acknowledge that materiality is considered pursuant to the objective standard identified above, we agree with the trial court that the issue is nonetheless subject to individual proof under the circumstances of this case. Universal insurance differs from term insurance in a variety of ways. Plaintiffs assume that anyone who purchases universal insurance does so because of one such difference: a universal policy (if sufficiently funded) can be permanent, while term insurance is not. But there are many other ways in which universal insurance varies from term insurance, and FUL and FFUL policyholders may have purchased their insurance for any of these reasons, including: the ability to skip payments and not lose coverage; the ability to increase or decrease FFUL premiums as financial circumstances require; the ability to change the death benefit without obtaining a new policy; and the ability to accrue tax-deferred interest. To a policyholder who purchased the FUL or FFUL with the goal of obtaining insurance for a fixed term, but with the flexibility offered by universal life, permanence would be irrelevant.

This is not a mere hypothetical scenario. Farmers submitted expert testimony indicating that "many, if not most" buyers of universal life do not intend for the insurance to be permanent or do not have an expectation one way or the other as to policy permanence. Moreover, Farmers relied on plaintiffs' own evidence that roughly half of the FFUL policyholders surveyed would have purchased the policy even if they had been told that the premiums were not guaranteed to keep the policy in force to maturity. Given this evidence, we agree with the trial court that it is impossible to determine, as a matter of common proof, whether the allegedly misrepresented permanence of the FUL and FFUL policies was material to the entire class of FUL and FFUL policyholders. While it may have been material to a sizeable

subclass of policyholders, plaintiffs made no attempt to seek certification of a class for whom materiality was subject to common proof.

### 4. *We Do Not Address Whether Commonality Exists with Respect to Any Other Purported Classes*

Plaintiffs next argue that policy underfunding negatively affects all policyholders, and is actionable *regardless* of how long the policyholder expects to keep the policy. As plaintiffs did not specifically seek certification on the basis of underfunding standing alone, the trial court did not address it.

Plaintiffs argued that Farmers set the premiums for the FUL policies so low that the policies would lapse even if the policyholders paid all of the premiums. Farmers disagreed, stating that, despite policy language which could be interpreted to the contrary, Farmers's practice was to keep the policies in force if the required premiums were paid, regardless of whether the accumulation account dropped to a zero balance. We express no opinion as to the merits of this issue. Plaintiffs have not attempted to certify a class of FUL policyholders whose policies lapsed even though they paid all required premiums.[26]

We have already noted other areas in which plaintiffs proffered evidence of further alleged Farmers's misconduct, such as the 20 percent surcharge imposed on policyholders paying their premiums quarterly. Plaintiffs have not sought to certify a class challenging any of these practices, nor does it appear that either of the named plaintiffs were actually subject to them. As we have already noted, we leave it to the trial court's discretion, on remand, to determine whether it should consider any subsequent motion for class certification, should plaintiffs choose to proceed on an alternative basis.

### 5. *Sanctions for Inadequate Record on Appeal**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## *DISPOSITION*

The order denying class certification is affirmed, and the matter remanded for further proceedings consistent with the views expressed in this opinion.

---

[26] Plaintiffs further argue that FUL premiums were simply set too low, based on an unreasonably high 11.5 percent interest rate. According to plaintiffs, as time passes, Farmers will impose substantial premium increases in order to keep the policies in force. Plaintiffs have not alleged that this has yet occurred, nor have they attempted to assert a class action on behalf of all FUL policyholders who have been subject to unreasonable premium increases as a result of Farmers's initial underfunding of the policies.

*See footnote, *ante*, page 544.

Farmers shall recover its costs on appeal from plaintiffs. As determined by the trial court upon remand and a proper motion, Farmers shall also recover its reasonable attorneys' fees and costs associated with the preparation of the respondents' appendix (to the extent such costs are not already recoverable by Farmers as the prevailing party on appeal) from plaintiffs' counsel.

Klein, P. J., and Kitching, J., concurred.

On August 1, 2011, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied October 19, 2011, S195814.