Filed 5/27/26; Certified for Publication 6/22/26 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BRIAN GUTHRIE, et al.,<br><br>     Plaintiffs and Appellants,<br><br>v.<br><br>TRANSAMERICA LIFE<br>INSURANCE COMPANY,<br><br>     Defendant and Respondent. | A171526<br><br>(Alameda County<br>Super. Ct. No. RG21098977) |

Plaintiffs and appellants Brian Guthrie and Grady Lee Harris, Jr. appeal from an order denying their motion for class certification of certain claims in their action against Transamerica Life Insurance Company (Transamerica). In their complaint, plaintiffs allege Transamerica violated all three prongs of the unfair competition law (Bus. & Prof. Code, § 17200 et seq. (UCL))—unlawful, unfair and fraudulent business practices[1]—in connection with its sale of a life insurance product referred to as "Trendsetter LB." They sought class certification of claims based solely on common

---

[1] "Each of these three prongs—unlawful, unfair, or fraudulent— implicates a different legal standard, although a single practice may simultaneously violate more than one prong of the UCL." (*Davis-Miller v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 106, 110, fn. 2.)

1

language in the policy.  On appeal, plaintiffs complain the trial court relied on improper criteria and erroneous legal assumptions in denying certification.  We affirm.

## BACKGROUND

### *The Transamerica Life Insurance Products at Issue*

Transamerica offers two term life insurance products within its "Trendsetter" series.  Trendsetter Super, the more basic product, has been sold by Transamerica for decades, during which time the company has issued hundreds of thousands of policies.  The policyholder pays premiums for a specific number of years and, if the insured dies during that term, the policyholder receives a death benefit in the amount set forth in the policy.  Trendsetter Super also includes a type of "living benefit[]" feature that allows the insured to access portions of the death benefit prior to death in the event of a qualifying terminal illness.  This benefit, generally referred to as an "accelerated death benefit," is a standard feature of many life insurance policies.[2]

Beginning in 2012, Transamerica began offering a second Trendsetter product—Trendsetter LB.  Like Trendsetter Super, the new LB product provides a fixed death benefit and an accelerated death benefit for qualifying terminal illnesses.  In addition, the Trendsetter LB product provides two other accelerated death benefits, for qualifying chronic and critical illnesses.  Transamerica developed Trendsetter LB as a "bundled" product, with the

---

[2] We use the terminology "accelerated death benefit," rather than "living benefit," because the policy language uses the terminology "accelerated death benefits," as do the governing provisions of the Insurance Code.  (Ins. Code, § 10295 et seq.)  All further statutory references are to the Insurance Code unless otherwise indicated.

2

three accelerated death benefits included through one endorsement (for qualifying terminal illness) and two "riders" (for chronic and critical illness).[3]

As a bundled product, the Trendsetter LB policy is sold at a single premium rate. The only additional charge an insured may incur is an administrative fee if the insured exercises the chronic, critical, or terminal accelerated death benefits. A Trendsetter LB policy owner may also add other, optional riders for an additional premium cost, such as a "Waiver of Premium Rider, Accident Indemnity Rider, Children's Insurance Rider, or Monthly Disability Income Rider." Plaintiffs were offered but declined, any additional optional riders.

Trendsetter LB policies contain, at the outset of the policy, several " 'policy data pages' " customized for each owner.[4]

---

[3] According to the National Association of Insurance Commissioners, "An endorsement, also known as a rider, adds, deletes, excludes or changes insurance coverage. An endorsement/rider can also be used to increase standard limits of coverage and take precedence over the original agreement or policy." (NAIC, *What is an Insurance Endorsement or Rider?* (Aug. 22, 2019) <https://content.naic.org/article/consumer-insight-what-insurance-endorsement-or-rider> [as of May 27, 2026]; see, e.g., §10295.8, subd. (a) [providing for 30-day cancellation period and making no substantive distinction between riders and endorsements; "If the accelerated death benefit is purchased as an endorsement or rider at the same time as the base life insurance policy, then the endorsement or rider may be returned within 30 days."].)

[4] The Insurance Code provisions governing policies that include accelerated death benefits for critical and chronic illness require that such policies be reviewed and approved by the State Insurance Commissioner. (§ 10295.3, subd. (a); see § 10295.4, subd. (a) [filings with the commissioner must include a "description of the accelerated death benefit, including the effects of payment of the accelerated death benefit on all life insurance benefits and any subsequent accelerated death benefits. . . ."].)

The first third or so of the first policy data page contains personal identifying information and sets forth the amount of the death benefit.

The next third or so of the first page, set off from the first third by a line of dashes, reads in plaintiffs' policies as follows:

THE CHARGE FOR ANY ADDITIONAL BENEFITS WHICH ARE PROVIDED BY RIDER IS SHOWN BELOW.  ONLY A BRIEF DESCRIPTION IS GIVEN.  THE COMPLETE PROVISIONS ARE INCLUDED IN THE RIDER.

| RIDER NUMBER | SCHEDULE OF ADDITIONAL BENEFITS | ANNUAL PREMIUM |
|---|---|---|
| | NONE | NO CHARGE |

Immediately below this schedule is another line of dashes, setting off the final third or so of the first page.  This section summarizes various payment options (e.g., annual, quarterly, monthly) and begins with the following statement:

TOTAL ANNUAL PREMIUM ON POLICY DATE                                    $2,895.00*[5]

*THE "ANNUAL PREMIUM" AND "TOTAL ANNUAL PREMIUM ON POLICY DATE" LISTED ON THIS PAGE ARE THE AMOUNT YOU WILL PAY PER YEAR ONLY IF YOU CHOOSE THE ANNUAL PREMIUM PAYMENT MODE.  THE AMOUNT YOU PAY PER YEAR MAY BE HIGHER IF YOU PAY PURSUANT TO ANY OTHER PAYMENT MODE.

INITIAL ANNUAL PREMIUM FOR POLICY EXCLUDING RIDERS:          $1,940.00
RATED EXTRA POLICY PREMIUM:                                               $955.00

The next data page contains a yearly premium schedule that commences as follows:

SCHEDULE OF NON-GUARANTEED PREMIUMS
–ANNUAL PREMIUMS–

| POLICY YEAR BEGINNING | POLICY EXCLUDING RIDERS |
|---|---|
| May 18 2018 | $2,895 |
| May 18 2019 | 2,895 |

---

[5] The annual premium amount shown is from plaintiff Guthrie's policy. The amount shown in the policies of other insureds, including plaintiff Harris's policy, differ depending on the death benefit amount and other features of the particular policy.

4

The first entry on this schedule is the " 'total annual premium on policy date' " identified on the first page. (Capitalization omitted.) The entries on this schedule continue through the term of the policy.

The data pages in both plaintiffs' policies are followed by seven pages of form contract language. These pages, in turn, are followed by the two accelerated death benefit riders—the "CHRONIC ILLNESS ACCELERATED DEATH BENEFIT RIDER" and the "CRITICAL ILLNESS ACCELERATED DEATH BENEFIT RIDER"—and the "TERMINAL ILLNESS ACCELERATED DEATH BENEFIT ENDORSEMENT." These riders/endorsements all state at the outset: "We have issued this rider [endorsement] as part of the policy to which it is attached. Except as otherwise specifically set forth below, it is subject to all of the terms of the policy." The chronic and critical illness riders further provide: "We have issued this rider in consideration of *the application* and payment of the premiums for *the* policy." (Italics added.)

The application forms completed by the insured are also appended to, and made part of, the Trendsetter LB policy. One of these forms specifically asks the applicant, as item "5," to identify "*Additional Benefits by Rider*: [ ] Waiver of Premium/Waiver Provision [ ] Accident Indemnity $___ [ ] Other ____, $____." (Italics added.) Plaintiffs did not check any box, nor did they make any other notation in item 5.

The application forms additionally show plaintiffs procured their policies through insurance agents.[6]

---

[6] The governing statutes include requirements for the training and education of agents selling policies with accelerated death benefits and provide, in part: "Insurers shall ensure that agents offering, marketing, or selling accelerated death benefits on their behalf are able to describe the differences between benefits provided under an accelerated death benefit and

5

*Allegations in the Complaint*

Plaintiffs filed suit in May 2021, on behalf of themselves and an alleged class of other Californians to whom Transamerica issued Trendsetter LB policies from that date to the present. Some six months later, plaintiffs filed a first amended complaint, which is the operative complaint (hereinafter "complaint").

In their complaint, plaintiffs allege the Trendsetter LB policy language promised the premium for the policy was " 'EXCLUDING RIDERS' " and therefore the additional accelerated death benefits for chronic illness and critical illness—included automatically in the Trendsetter LB policy—were being included at " 'NO CHARGE' " in the policies' " 'TOTAL ANNUAL PREMIUM.' " Plaintiffs claim these promises "misleadingly portrayed" the Trendsetter LB policy as including the accelerated death benefit riders "for no premium charge or other cost." In other words, according to plaintiffs, "these promises falsely portrayed the Trendsetter LB policy as costing the same as a Trendsetter level premium term policy without the Riders [i.e., as costing the same as Trendsetter Super], which simply was not true." This is so, claim plaintiffs, because Transamerica assertedly admitted during discovery that the total annual premium charged for their Trendsetter LB policies includes charges for the three automatically included accelerated death benefit endorsement and riders.

benefits provided under long-term care insurance," including: "(1) The difference between the benefits afforded to an insured through an accelerated death benefit and a long-term care insurance policy or rider. [¶] (2) The differences between benefit eligibility criteria. [¶] . . . [¶] (4) The benefits under the accelerated death benefit or long-term care insurance if benefits are never needed. [¶] (5) The benefits under the accelerated death benefit or long-term insurance if benefits are needed. [¶] . . . [¶] (8) Income and death benefit considerations." (§ 10295.12, subd. (a)(1), (2), (4), (5), (8).)

In other words, plaintiffs make no claim they did not receive the benefits for which they paid, i.e., term life insurance and the chronic, critical, and terminal illness accelerated death benefits. Rather, they complain that the premium set forth in the Trendsetter LB policy was not broken down to show separate charges for each of the four constituent parts of the bundled policy (the term life insurance and the accelerated death benefit endorsement and riders). They maintain this somehow caused consumers not to understand they could acquire lesser coverage—i.e., term life and only the terminal illness accelerated death benefit—at a lesser cost under the Trendsetter Super policy.

In their complaint, plaintiffs characterize the Trendsetter Super product as offering "the same basic Trendsetter Series level premium term life insurance coverage without all of the 'Riders' for a significantly lower level premium." They allege Transamerica had a duty to disclose this assertedly "material information" about its premium charge in the bundled Trendsetter LB product (which automatically includes the three accelerated death benefits) and the basic Trendsetter Super policy (which has only one of these accelerated death benefits), as part of its obligations under the Insurance Code. According to plaintiffs, Transamerica's conduct also frustrates the purpose and intent of section 10127.9—the 30-day free look statute which allows policy holders to review and consider returning their policies during that timeframe for a full refund—because policyholders had no reason to carefully consider the accelerated death benefit riders they assertedly thought they were getting for free and also had no reason to ask if Transamerica provided the same basic Trendsetter term life insurance (without the included riders) at a lower premium.

Transamerica's asserted failure to "correct these false and misleading statements by disclosing the premium charge for the Riders or the cost of a comparable Trendsetter Super policy was," claim plaintiffs, "unlawful, unfair and deceptive" under the UCL. They seek restitution, suggesting the amount "may be determined by calculating the amount of charges in the Trendsetter LB policy premium Plaintiffs and the Class paid for the Riders or, alternatively, calculating the amount of extra premium Plaintiffs and the Class paid during the level premium period over that which they would have paid for a Trendsetter Super policy with the same basic term insurance coverage (plus accounting for any premium charge for the [terminal illness] coverage in the Trendsetter Super policy)." In short, plaintiffs propose a restitution model that effectively makes the premium for the Trendsetter LB policy with greater benefits, the same as the premium for the Trendsetter Super policy with fewer benefits—the rationale being consumers were allegedly under the impression the additional accelerated death benefits provided by the Trendsetter LB policy were free.

### Motion for Class Certification

Plaintiffs subsequently filed a motion for class certification, seeking to certify a class of "[a]ll persons in the state of California who, from May 11, 2017 through the date the Class is certified, paid for, were issued, and did not cancel within 30 days after receipt a Transamerica Trendsetter LB individual term life insurance policy." Such a class should be certified, plaintiffs maintained, because: (1) they had standing to pursue the UCL claims pleaded in the operative complaint; (2) the proposed class was ascertainable and sufficiently numerous; (3) there was a well-defined community of interest because common questions of law and fact predominated, their claims were

8

typical of the class, and they would adequately represent the class; and (4) proceeding as a class would be superior to the alternatives.

The crux of plaintiffs' claims as to which they sought class certification is considerably narrower than the claims alleged in their complaint. Specifically, they sought certification of claims that the Trendsetter LB policy language, in and of itself, is misleading, pointing to the language on the data pages stating "THE 'ANNUAL PREMIUM' CHARGED" for the " 'POLICY EXCLUDING RIDERS' " and asserting the premium, in fact, includes within it a charge for the additional accelerated death benefit riders. According to plaintiffs, this asserted misrepresentation runs afoul of section 332—which requires parties to insurance contracts to "communicate to the other, in good faith, all facts within [the party's] knowledge which are or which [they] believe[] to be material to the contract and as to which [they] make no warranty, and which the other has not the means of ascertaining"—and sections 330 and 331, which speak to intentional or unintentional concealment of such facts. Plaintiffs further assert this misrepresentation continued during the statutorily required "free look" period set forth in sections 10127.9 and 10295.8, when policyholders are permitted to examine the complete terms of their policy with the option of returning it for a refund. As a result, plaintiffs claim they and other members of the class purportedly "unknowingly paid premiums for the Riders," which if " 'EXCLUDED' " from the " 'ANNUAL PREMIUM' " as represented in their policies would have resulted in a lower " 'ANNUAL PREMIUM' " than they were charged.

Thus, unlike their complaint, plaintiffs' certification motion encompassed no claims based on comparing the Trendsetter LB product with the Trendsetter Super product.

In their motion, plaintiffs acknowledged Transamerica's position—that " 'there is no misrepresentation in the Policy Data pages of Plaintiffs' Trendsetter LB Policies' " because Trendsetter LB is a bundled product, " 'meaning it includes both a term life insurance benefit plus Chronic Illness, Critical Illness, and Terminal Illness benefits which are conferred by riders automatically included with the term life insurance at issuance,' " and that plaintiffs and other putative class members knew they were purchasing a bundled product that automatically included the three accelerated death benefits along with the term death benefit.

Plaintiffs maintained, however, that knowing the accelerated death benefits are automatically included in the bundled product is different from knowing the annual premium includes a charge for these riders. In support of this assertion, they submitted a declaration from their insurance expert opining there would be no reason for policyholders not to take Transamerica's " 'POLICY EXCLUDING RIDERS' representation at face value."

Plaintiffs further claimed Transamerica had produced nothing in discovery indicating "Plaintiffs or any other Trendsetter LB policyholder would have been told that there was a premium charge for the Riders, whether 'inherent' to the premium they were charged or not." And even if such information had been provided, that fact, they asserted, "would not defeat Plaintiffs' claims." This is so, argued plaintiffs, because their claims "are premised on Transamerica's systemic misrepresentation and breach of its unambiguous 'POLICY EXCLUDING RIDERS' provision in its standard form Trendsetter LB policies," and where "the policy language is clear and explicit, it governs." (Boldface & italics omitted.) "Since Plaintiffs' claims arise from unambiguous contract language, there will be no need for the Court to go beyond the terms of the Trendsetter LB [policy] to resolve the

10

merits of Plaintiffs' claims.  Instead, they can be resolved based upon the common language in the Trendsetter LB policies, yielding a common result for the Class."

***Opposition to Certification Motion***

In its opposition to the certification motion, Transamerica maintained plaintiffs' claims that it misrepresented and omitted material facts about its Trendsetter LB product were not suitable for class certification because it would "necessarily require individualized proof to assess what information [Transamerica] and third-party brokers and agents provided to each policyholder."  Transamerica further asserted the contractual language plaintiffs challenge is true and correct:  It "applies 'NO CHARGE' for any 'ADDITIONAL BENEFITS WHICH ARE PROVIDED BY RIDER.'  The statement 'NO CHARGE' clearly appears next to the word 'NONE'—it does not, for example, state 'Chronic illness . . . No charge.' "  Moreover, the column titled " 'POLICY EXCLUDING RIDERS' " is consistent and accurate because it includes only the quoted rates for the base term LB policy, which excludes additional, optional riders.  In other words, from Transamerica's perspective, the policy language adequately distinguishes between the automatically included accelerated death benefit riders for which there is no additional annual premium charge, and other optional riders for which there are additional premium charges, which would be shown on the schedule on the first page of the data pages.

Transamerica also disagreed with plaintiffs' assertion that it had conceded during discovery that there is a separate charge for the accelerated death benefit riders included within the Trendsetter LB policy.  What the company actually said was that "any 'charges' for living benefits coverage 'were inherent in the design of the Trendsetter LB product and fully

11

integrated with the total premium amount applicable to Trendsetter LB policies.' " Transamerica would never agree "there exist discrete, calculable 'charges' for each living benefits rider"; indeed, the actuary involved in designing the Trendsetter LB product "cannot even conceive of a way to calculate separate 'charges' for each bundled benefit." As Transamerica saw it, plaintiffs' real grievance was that they should have been told about the less expensive Trendsetter Super term life product which provides lesser benefits.

Transamerica additionally relied on an expert declaration from an economist (Merrill) who opined that consumers would be able to make "an informed economic choice" when purchasing the Trendsetter LB product.

Plaintiffs filed objections to the Merrill declaration, along with a rebuttal declaration from another economist (Smith). Transamerica, in turn, challenged plaintiffs' objections to its expert's declaration and objected to their rebuttal declaration.

### *Denial of Certification Motion*

#### *Initial Ruling on the Motion*

The trial court denied the motion for class certification in part and granted it in part in August 2024. Preliminarily, it concluded the proposed class was sufficiently numerous, noting Transamerica had stipulated that, since May 11, 2017, "it has issued more than 38,000 Trendsetter LB policies in California." The court also found the class to be ascertainable based on Transamerica's stipulation it could identify the policy owners for each such Trendsetter LB policy, along with all necessary facts related to that policy.

With respect to the scope of the posited class claims, the court—based on plaintiffs' repeated assertions—ruled they were based solely on language in Transamerica's Trendsetter LB policy. It went on to state that permitting

12

a plaintiff to focus a claim so narrowly in an effort to prevent a defendant from presenting its defenses to the claims alleged in the operative pleading is inconsistent with due process. Here, Transamerica was entitled to defend against the claims alleged against it in the complaint by presenting evidence at trial about its other insurance products and marketing materials, along with any additional evidence that might provide context for the policy language at issue.

Turning next to the issue of predominance, the court first considered plaintiffs' "unlawful" UCL claim. This claim was premised on sections 330 through 332 related to concealment, which is defined as "[n]eglect to communicate that which a party knows, and ought to communicate. . . ." (§ 330.) Pursuant to section 332, "[e]ach party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining." The trial court concluded common issues did not predominate as to this claim because it "necessarily concerns not just the standard-form Trendsetter LB policy text but also all the other information that was conveyed to purchasers of the Trendsetter LB policies, including marketing materials and oral representations by agents. The marketing materials and oral representations communicated to each member of the putative class would be different, which presents individual issues that cannot be resolved on a common classwide basis."

The court next rejected certification of plaintiffs' "unfair" UCL claim to the extent it was based on these same statutory provisions. In doing so the court applied the unfairness test this district has adopted in the consumer context. This test requires that " 'the allegedly unfair business practice be

13

"tethered" to a legislatively declared policy or has some actual or threatened impact on competition.' " To the extent the plaintiffs' unfair claim was tethered to sections 330 through 332, the court concluded common issues did not predominate for the same reasons they did not for purposes of their "unlawful" claim—i.e., resolution of whether unfair concealment occurred would implicate, in addition to the relevant policy language, information conveyed to individual purchasers.

As for the plaintiffs' "fraudulent" UCL claim, the court observed it involved whether the policy language relied on by plaintiffs is "likely to deceive" a reasonable consumer, and this was analogous to their "unlawful" concealment claim. Common issues did not predominate for the same reasons.

In contrast, the court found common issues did predominate with respect to plaintiffs' unlawful and unfair claims based on section 10127.9, which "requires life insurance policies to include a notice that 'the policy may be returned by the owner for cancellation' not less than 10 and not more than 30 days after receipt, and that in such cases, all premiums paid will be refunded." The court concluded the issue of whether Transamerica's standard policy language included the required notice was common to all class members. However, while the court certified the section 10127.9 claims, it observed the operative complaint "appears to allege" that Transamerica *had* complied with this statute.

Finally, with respect to typicality, while the court identified concerns as to plaintiffs' fraud and concealment claims, which it did not certify, it found plaintiffs "sufficiently typical" for purposes of the certified claim under section 10127.9. It also concluded plaintiffs were "sufficiently adequate" to represent the class with respect to the certified claims.

14

***First Clarification of Certification Order***

The following month, plaintiffs sought an ex parte order clarifying the trial court's certification ruling. Specifically, plaintiffs asked the court to clarify that their unlawful and unfair UCL claims based on section 10127.9 encompassed their allegation that the asserted misrepresentations in the Trendsetter LB policy language denied "policyholders the ability to understand and examine the true terms of their policies," thereby violating "the purpose, intent and spirit of the free look statute." While plaintiffs thought the order was already clear on this point, Transamerica was taking the position the certification ruling limited their section 10127.9 claim to whether the company had printed the requisite statutory notice in each Trendsetter LB policy and/or failed to provide a requested refund.

Transamerica opposed the clarification request, asserting the trial court "plainly declined" to certify plaintiffs' claims to the extent premised on alleged concealments or misrepresentations by Transamerica regarding how its Trendsetter LB policies are priced. Rather, as the court had explained, such claims "necessarily involve individualized evidence regarding the information communicated to each class member, so common issues would not predominate."

Plaintiffs responded that "if Transamerica's interpretation of the Order is correct, the Court not only certified a claim Plaintiffs never brought and have no intention of pursuing, but it certified a claim which all parties— including Plaintiffs—agree would be utterly meritless and self-evidently dead on arrival because the notice was printed in the LB policies and there is no allegation (let alone any evidence) a requested refund was not paid."

The trial court agreed with Transamerica that its certification of the plaintiffs' unlawful and unfair UCL claims predicated on section 10127.9

were "limited to whether defendant had a policy or practice of failing to provide the required notice."

### *Second Clarification of Certification Order*

Plaintiffs then sought an ex parte order amending the certification ruling to deny their class certification motion in its entirety. Plaintiffs stated the one claim the court had certified—alleging Transamerica had failed to provide the notice required under section 10127.9—was not one they had brought or could bring in good faith.

The court amended its certification ruling as requested, noting its now complete denial of class certification was based, collectively, on its two prior orders and plaintiffs' representation they never intended to bring a claim for failure to provide the statutory notice required under section 10127.9.

## DISCUSSION

### *Class Certification Overview*

#### *Legal Framework*

" ' "Courts long have acknowledged the importance of class actions as a means to prevent a failure of justice in our judicial system. [Citations.] ' "By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress. . . ." ' [Citation.] Generally, a class suit is appropriate 'when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer.' [Citations.] But because group action also has the potential to create injustice, trial courts are required to ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' " ' "

16

(*Kaldenbach v. Mutual of Omaha Life Ins. Co.* (2009) 178 Cal.App.4th 830, 843 (*Kaldenbach*).)

"'"Code of Civil Procedure section 382 authorizes class suits in California when '"the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." To obtain certification, a party must establish the existence of both an ascertainable class and a well-defined community of interest among the class members. [Citations.] The community of interest requirement involves three factors: "(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class."'"'" (*Fairbanks v. Farmers New World Life Ins. Co.* (2011) 197 Cal.App.4th 544, 561 (*Fairbanks*), quoting *Kaldenbach, supra,* 178 Cal.App.4th at p. 843.)

Here, we are largely concerned with a single aspect of the trial court's certification decision—whether questions of common or general interest predominate. "The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule if the defendant's liability can be determined

17

by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021–1022, fn. omitted (*Brinker*); see *Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 941 (*Knapp*) ["Commonality as a general rule depends on whether the defendant's liability can be determined by issues common to all class members."].)

" 'The burden remains with the proponent of class certification to show common issues predominate.' " (*Apple Inc. v. Superior Court* (2018) 19 Cal.App.5th 1101, 1116 (*Apple*).)  It bears repeating that, " 'when assessing whether the plaintiff has satisfied that burden, the evidence must be evaluated under the prism of the plaintiff's theory of recovery.' [Citation.] A plaintiff's theory of recovery, moreover, must conform to the legal elements of the causes of action in its complaint, and it is those elements which must be considered to determine whether common issues predominate.  [Citations.] [¶] 'Although predominance of common issues is often a major factor in a certification analysis, it is not the only consideration.  In certifying a class action, the court must also conclude that litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently.  [Citation.]  "[W]hether in a given case affirmative defenses should lead a court to approve or reject certification will hinge on the manageability of any individual issues." ' " (*Ibid.*)

Generally, " '[t]he certification question is "essentially a procedural one that does not ask whether an action is legally or factually meritorious." ' [Citations.]  A class certification motion is not a license for a free-floating inquiry into the validity of the complaint's allegations; rather, resolution of disputes over the merits of a case generally must be postponed until after

18

class certification has been decided [citation], with the court assuming for purposes of the certification motion that any claims have merit [citation]." (*Brinker*, *supra*, 53 Cal.4th at p. 1023.)

Sometimes, however, " 'issues affecting the merits of a case may be enmeshed with class action requirements.' " (*Brinker*, *supra*, 53 Cal.4th at p. 1023.) "When evidence or legal issues germane to the certification question bear as well on aspects of the merits, a court may properly evaluate them." (*Id.* at pp. 1023–1024.) "The rule is that a court may 'consider[] how various claims and defenses relate and may affect the course of the litigation' even though such 'considerations . . . may overlap the case's merits.' " (*Id.* at p. 1024.)

### *Standard of Review*

" '[T]he trial court has great discretion with regard to class certification, and its decision will not be disturbed on appeal if it is supported by substantial evidence, unless it was based upon improper criteria or erroneous legal assumptions. [Citations.] [¶] Ordinarily, appellate review is not concerned with the trial court's reasoning but only with whether the result was correct or incorrect. [Citation.] But on appeal from the denial of class certification, we review the reasons given by the trial court for denial of class certification, and ignore any unexpressed grounds that might support denial. [Citation.] We may not reverse, however, simply because *some* of the court's reasoning was faulty, so long as *any* of the stated reasons are sufficient to justify the order.' " (*Fairbanks*, *supra*, 197 Cal.App.4th at p. 561, quoting *Kaldenbach*, *supra*, 178 Cal.App.4th at pp. 843–844.)

Predominance, however, " 'is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.] We must "[p]resum[e] in favor of the

19

certification order . . . the existence of every fact the trial court could reasonably deduce from the record." ' " (*Apple*, *supra*, 19 Cal.App.5th at p. 1117.)

### No Abuse of Discretion in Denying Class Certification

Plaintiffs' argument as to why class certification should have been granted can be summed up as follows:  Because the claims as to which certification was sought are predicated solely on assertedly unambiguous form language in the Trendsetter LB policy, common issues necessarily exist and predominate, as all that needs to be considered in determining liability is the policy language.  Plaintiffs' view of their claims, even as pared down for certification purposes, is, as the trial court ruled, too truncated.

To begin with, the policy language on which plaintiffs focus is not, contrary to what they assert, susceptible to only one reasonable interpretation, specifically theirs.  While plaintiffs focus solely on the language they have identified on the first two data pages, it is fundamental that "we read a contract as a whole in order to 'give effect to every part, if reasonably practicable, each clause helping to interpret the other.'  (Civ. Code, § 1641.)" (*Van Ness v. Blue Cross of California* (2001) 87 Cal.App.4th 364, 372.)  In other words, "we do not find contract language ambiguous in the abstract.  Rather, we construe contractual language in the context of the instrument as a whole, and under the circumstances of the case." (*Id.* at p. 373.)

There are numerous other provisions of the Trendsetter LB policy that pertain to riders, none of which plaintiffs have acknowledged.  For example, the pages of form contractual provisions following the data pages include a section titled, "PREMIUMS."  A paragraph therein, titled, "Schedules of Premiums" states:  "Premiums for this policy (excluding premiums for *certain*

20

Riders) will remain level until the First Premium Increase Date shown in the Policy Data." (Italics added.)

These pages are followed by the accelerated death benefit riders and endorsement—the "CHRONIC ILLNESS ACCELERATED DEATH BENEFIT RIDER," the "CRITICAL ILLNESS ACCELERATED DEATH BENEFIT RIDER," and the "TERMINAL ILLNESS ACCELERATED DEATH BENEFIT ENDORSEMENT." Each states at the outset: "We have issued this rider [endorsement] *as part of the policy* to which it is attached. Except as otherwise specifically set forth below, it is subject to all of the terms of the policy." (Italics added.) The chronic and critical illness riders further provide: "We have issued this rider in consideration of *the application and* payment of the *premiums for the policy*." (Italics added.)

The three riders are followed by the executed application forms, which are included in, and form part of, the policy. One of these forms specifically asks the applicant, as item "5," to identify "*Additional Benefits by Rider*: [ ] Waiver of Premium/Waiver Provision [ ] Accident Indemnity $___ [ ] Other ____, $____." (Italics added.) Notably, the "Additional Benefits by Rider" language in the application is *identical* to the language that appears on the first data page that plaintiffs claim misleadingly states there is no charge for the accelerated death benefit riders automatically included in the policy. The application identifies only *other* optional benefits provided by rider, and if any such additional rider is added, the application further identifies the premium for that rider. As we have recited, the plaintiffs declined to purchase any additional benefit riders and therefore no box was checked, nor was any notation made, on item 5 of their applications.

In short, when considered in context and in light of all the other provisions of the Trendsetter LB policy, the language on the data pages on

21

which plaintiffs rely is—*on its face*—ambiguous. That language certainly is not the outright misstatement plaintiffs claim; at best they have offered up an arguably plausible reading of the language. On the other hand, the language does not clearly say what Transamerica says it means either, although other provisions support the company's reading of the language.

As we have recited, plaintiffs argued in their motion that certification was proper because their claims "are premised on Transamerica's systemic misrepresentation and breach of its *unambiguous* 'POLICY EXCLUDING RIDERS' provision in its standard form Trendsetter LB policies," (italics added) and "[s]ince Plaintiffs' claims arise from *unambiguous* contract language, there will be no need for the Court to go beyond the terms of the Trendsetter LB [policy] to resolve the merits of Plaintiffs' claims. Instead, they can be resolved based upon the common language in the Trendsetter LB policies, yielding a common result for the Class." (Italics added.) Thus, plaintiffs effectively conceded that if the language were ambiguous, certification would be inappropriate.

Given the significance to plaintiffs' certification motion of whether the policy language on which they rely is unambiguous or ambiguous, it is, under *Brinker*, an appropriate merits-related issue for us to address. (See *Brinker*, *supra*, 53 Cal.4th at pp. 1023–1024 ["When evidence or legal issues germane to the certification question bear as well on aspects of the merits, a court may properly evaluate them."]; *id.* at p. 1024 ["whether an element may be established collectively or only individually, plaintiff by plaintiff, can turn on the precise nature of the element and require resolution of disputed legal or factual issues affecting the merits"].)

Even if we were inclined not to address plaintiffs' predicate assertion that the policy language on which they rely is unambiguous, we would

22

conclude that the trial court did not abuse its discretion in denying their certification motion.

The trial court concluded the claims as to which certification was sought "necessarily" concerned not just the form language on which plaintiffs rely, but also other information conveyed to purchasers of the policies, including marketing materials and oral representations by agents. Thus, as the court saw it, the claims entailed numerous individual issues that could not be resolved on a common basis for all class members. In reaching this conclusion, the court relied on *Kaldenbach*, *supra*, 178 Cal.App.4th 830 and *Fairbanks, supra*, 197 Cal.App.4th 544.

In *Kaldenbach*, *supra*, 178 Cal.App.4th 830, the court considered UCL class claims pertaining to cash value life insurance in the "vanishing premium" context. (*Id.* at p. 834.) " 'Cash value life insurance combines "pure" life insurance with an investment component that creates a potential accumulation of money in the policy.' " (*Ibid.*) Under a "vanishing premium" plan, " 'the policyholder pays higher-than-normal premiums in the early years of the policy, resulting in a quicker accumulation of premium dollars for investment purposes [citations]. These policies are marketed on the premise that enough cash value will accumulate so that at a fixed date future administrative and insurance costs will be covered and the policyholder relieved of any further out-of-pocket premium obligations.' " (*Ibid.*)

Kaldenbach purchased such a policy but was later informed the accumulated cash reserves were no longer adequate to continue paying the premium and the policy would lapse if he did not start making premium payments again. (*Kaldenbach*, *supra*, 178 Cal.App.4th at pp. 835–836.) He filed suit and moved to certify class claims, including fraud under the UCL, based on alleged misrepresentations and omissions. Specifically, he alleged

23

the insurer "provided computer illustrations and uniform sales materials to its agents that allowed [his agent] to mislead him into believing a low cost of actual insurance combined with a very high rate of interest to be earned on the cash accumulation component of his premium payment would act in concert to generate adequate returns to cover the cost of his life insurance until the maturity date of the policy." (*Id.* at p. 836.) He further asserted the insurer's sales operations and presentations relating to the type of policy at issue were uniform in every respect and that it utilized standardized training methods, materials, and scripts. "Agents were required to adhere to a sales script, and were specifically trained to disclose only the potential benefits of the policy but conceal the risks." (*Ibid.*)

In opposition, the insurer presented evidence the information given to each prospective purchaser varied, there was no standardized sales method, agents were not required to use sales materials, and training varied among agents. (*Kaldenbach*, *supra*, 178 Cal.App.4th at p. 839.)

The trial court denied certification on the ground it would take " 'individual evaluation of each claim to determine liability,' " and thus Kaldenbach had not established typicality. (*Kaldenbach*, *supra*, 178 Cal.App.4th at p. 841.) It also questioned ascertainability and numerosity. (*Ibid*.) Further, commonality had not been established because there was no evidence linking the insured's common tools "to what was actually said or demonstrated in any individual sales transaction." (*Id.* at pp. 841–842.)

The Court of Appeal affirmed. (*Kaldenbach*, *supra*, 178 Cal.App.4th at p. 844.) Specifically, it agreed with the trial court that the "individualized issues the court found to predominate, includ[ed] whether any given agent took [the insured's] training, read its manuals, and routinely followed the

24

training and materials; and what materials, disclosures, representations, and explanations were given to any given purchaser.  These individualized issues go not to the injury suffered by a purchaser, but to whether there was in fact an unfair business practice." (*Id.* at p. 848.)

In *Fairbanks, supra*, 197 Cal.App.4th 544, the court considered claims involving a universal life insurance policy.  In such policies, "premium payments are paid into the policyholder's accumulation account.  The insurance company credits the accumulation account with interest on its balance, and deducts from the accumulation account the annual cost of insurance." (*Id.* at p. 548.)  The universal life products at issue had two death benefit options.  "One, like term insurance, is a level death benefit.  The other, which is another purported advantage of universal life, is an increasing death benefit.  Consider a hypothetical policy value of $500,000.  When a universal life policyholder chooses an *increasing death benefit*, the amount paid the beneficiary at the policyholder's death is the set policy value ($500,000) *plus* the amount then in the policyholder's accumulation account.  In contrast, when a universal life policyholder with a *level death benefit* dies, the accumulation account partially offsets the policy value, and the insurer is therefore required to pay only the difference between the accumulation account and the policy value ($500,000).  Put another way, the total policy benefit would be $500,000, *including* the amount in the accumulation account." (*Ibid.*)  "[W]ith an increasing death benefit, the cost of insurance deducted from the account will increase each year; that is, the cost to provide the policyholder with a hypothetical $500,000 in coverage goes up as the policyholder ages.  With a level death benefit, however, as long as the balance in the accumulation account continues to increase (with premium payments and accrued interest), the amount of insurance which needs to be purchased

25

each year decreases." (*Id.* at pp. 548–549.)

Farmers sold two universal life policies with the two death benefit options, one of which had an additional benefit: "Within broad limits, the policyholder could pay as much, or as little, as the policyholder wanted. The policy would remain in effect regardless of the amount of premium paid as long as there was a sufficient balance in the accumulation account to pay the cost of insurance." (*Fairbanks, supra*, 197 Cal.App.4th at p. 549, fn. omitted.)

The crux of the plaintiffs' complaint was that Farmers designed and marketed the two universal life policies "in such a way that the premiums paid would be inadequate to keep the policies in effect until maturity, resulting in the underfunding of the policies, and their eventual lapse." (*Fairbanks, supra*, 197 Cal.App.4th at p. 550.) They sought certification of fraud and concealment UCL claims. (*Id.* at p. 552.) Specifically, they alleged a single fraudulent scheme by Farmers " 'directed at persuading policyholders to buy underfunded term insurance policies in the belief that they would offer the kind of permanent protection whole life policies provide at a lower cost.' " (*Id.* at p. 553.) Plaintiffs maintained their claims could be established through "a combination of common policy language, common language in annual policyholder statements, and a common marketing scheme."[7] (*Fairbanks*, at p. 553.)

Farmers raised numerous arguments in opposition to certification. It asserted, for example, "that, even if the policies were represented as

_____

[7] For instance, while nothing in the policies stated they were permanent, the plaintiffs relied on language such as the following statement: " 'This LIFE INSURANCE policy provides death protection *for as long as you live during the period of coverage.* That period, the premium payment details, and other policy data, are shown in the Policy Specifications on the last page of this policy.' " (*Fairbanks, supra*, 197 Cal.App.4th at p. 554, fn. 11.)

'permanent,' the materiality of such a representation would vary by policyholder." (*Fairbanks, supra*, 197 Cal.App.4th at p. 554.)  It claimed, "it is impossible to argue that a policy is 'underfunded' in the abstract" because "a policy can only be underfunded if it lacks the funds to meet the specific policyholder's needs at any given time." (*Id.* at p. 555.)  And it submitted substantial documentation indicating that its marketing was not subject to common proof.  (*Id.* at pp. 556–557.)

The trial court denied certification, concluding predominant common questions of fact or law did not exist.  (*Fairbanks, supra*, 197 Cal.App.4th at p. 558.)  The court explained "the design of the policies was only relevant to the extent that (1) Farmers marketed the policies as permanent insurance; (2) the class members wanted permanent insurance; and (3) the class members relied on Farmers's representations of permanence." (*Ibid.*)  And it stated, "that whether *marketing materials produced by Farmers* made representations of permanence was subject to common proof, but whether those materials were conveyed to prospective policyholders, or other representations of permanence were made, was not." (*Id.* at p. 559.)

The Court of Appeal affirmed.  (*Fairbanks, supra*, 197 Cal.App.4th at p. 561.)  It observed that " ' "[t]o state a claim under . . . the UCL . . . based on false advertising or promotional practices, 'it is necessary only to show that "members of the public are likely to be deceived." ' " '  [Citation.]  A representative plaintiff need not prove that members of the public were actually deceived by the practice, relied on the practice, or suffered damages." (*Id.* at pp. 561–562.)  "Nonetheless, a class action cannot proceed for a fraudulent business practice under the UCL when it cannot be established that the defendant engaged in uniform conduct likely to mislead the entire class." (*Id.* at p. 562.)  It found the situation "virtually identical" to that in

27

*Kaldenbach.*  (*Ibid.*)  Thus, "[b]ecause the trial court determined, based on substantial evidence, that the alleged misrepresentations of permanence were not commonly made to members of the class, the denial of class certification must be upheld."  (*Id.* at p. 564.)

The *Fairbanks* court then considered an argument raised by the plaintiffs for the first time on appeal—"that the class action must be allowed to proceed because it cannot be disputed that the *language in the policies themselves* which suggests permanence is indisputably amenable to common proof."  (*Fairbanks, supra*, 197 Cal.App.4th at p. 564.)  The appellate court disagreed: "While policy language clearly is amenable to common proof, plaintiffs did not seek class certification on the basis that the policy language standing alone was misleading; they alleged that it was misleading in the context of the entire marketing scheme."  (*Ibid.,* italics omitted.)  It went on to state:  "In any event, *even if [the] plaintiffs were permitted to now raise the argument that they seek to proceed with a class action based solely on the allegedly misleading language of the policies, it is still impossible to consider the language of the policies without considering the information conveyed by the Farmers agents in the process of selling them.*  (See *Knapp* []*, supra,* 195 Cal.App.4th at p. 944 [individual issues prevailed when many of the class members may have received information explaining the allegedly concealed fact].)"  (*Ibid.,* italics added; see *In re Countrywide Financial Corp. Marketing and Sales Practices Litigation* (S.D.Cal. Dec. 16, 2011) 2011 WL 6325877, at pp. *6–*9 (*Countryside Financial*) [there is a "critical distinction" between cases that allege agents followed the same marketing script (amenable to certification) and cases where agents were not so limited (certification not appropriate); rejecting the plaintiffs' relying-only-on-language argument quoting the *Fairbanks* paragraph].)

28

*Kaldenbach* and *Fairbanks* are distinguishable to the extent they involved allegedly deceptive marketing schemes. Nevertheless, as the trial court recognized, the cases present many "similar circumstances" to those here and support the court's decision to deny certification because plaintiffs' claims "necessarily concern[] not just the standard-form Trendsetter LB policy text but also all the other information that was conveyed to purchasers of the Trendsetter LB policies."

What plaintiffs ignore in asserting the two cases are wholly inapposite is that even assuming for purposes of the certification motion the policy language at issue is, in and of itself, misleading, that issue of common proof is insufficient to establish common *liability* under the statutes on which they base their "unlawful" and "unfair" UCL claims—sections 330 through 332, and section 10127.9.

As we have discussed, section 332 requires parties to insurance contracts to "communicate to the other, in good faith, all facts within [the party's] knowledge which are or which [they] believe[] to be material to the contract and as to which [they] make no warranty, and which the other has not the means of ascertaining." And sections 330 and 331 speak to intentional or unintentional concealment of such facts. Thus, the inquiry under these three predicate statutes requires consideration, not only of the policy language, but also of what information was provided or imparted to policy purchasers *above and beyond* that language. (*Fairbanks, supra,* 197 Cal.App.4th at p. 564.)

Indeed, section 332 requires parties to insurance contracts to "communicate to the other, in good faith, *all facts within [the party's] knowledge* which are or which [they] believe[] to be material to the contract and as to which [they] make no warranty, and which the other has not the

29

means of ascertaining." (§ 332, italics added.) The governing statutes also contemplate that agents can and will confer with prospective purchasers about policies with accelerated death benefits. (§ 10295.12.) Thus, as the trial court observed, Transamerica will be able to seek the admission of marketing materials and other extrinsic evidence in its defense of the claims based on these statutes.

With respect to plaintiff's UCL fraud claim, the question is whether the data-page language on which plaintiffs rely is "likely to deceive" a reasonable consumer. In this regard, plaintiffs face the problem that not all Trendsetter LB policies are the same. While the policies purchased by putative class members all contained the "POLICY EXCLUDING RIDERS" language in the data pages on which plaintiffs rely, these pages are also customized based on the specific product purchased by the particular consumer.

Significantly, the schedule of "ADDITIONAL BENEFITS WHICH ARE PROVIDED BY RIDER" and the columns thereunder on the first data page differ among insureds, depending on whether the insured has purchased any optional additional benefits. Because plaintiffs declined any such optional benefits, the rider number column in their data pages is blank, the word "NONE" is in the "SCHEDULE OF ADDITIONAL BENEFITS" column, and the notation "NO CHARGE" is in the "ANNUAL PREMIUM" column. Correspondingly, item 5 of their applications—which requires that any "Additional Benefits by Rider" be identified and priced—has no boxes checked nor any other notation of additional benefits by rider.

In contrast, other insureds who do purchase "Additional Benefits by Rider" will so state in item 5 of their applications, identifying both the rider and the additional premium cost for such. The schedule of "ADDITIONAL BENEFITS WHICH ARE PROVIDED BY RIDER" on the first data page of

30

their policies, in turn, will list the "RIDER NUMBER," the "NAME OF THE ADDITIONAL RIDER," and the "ANNUAL PREMIUM" for each additional benefit. Clearly, these different textual and graphical differences could impact a particular insured's reasonable understanding of the "ADDITIONAL BENEFITS WHICH ARE PROVIDED BY RIDER" language and the rider and premium schedules.

In short, even if limited to the four corners of the policy document, the Trendsetter LB policies differ *at issuance* based on the application process and the language of the customizable pages.

Additionally, the plaintiffs' applications show that they purchased their policies through agents, and as we have recited, the statutory provisions governing the accelerated death benefits provided by the Trendsetter LP policy clearly anticipate that agents can, and will, discuss these policies with applicants. (See § 10295.12.) Indeed, plaintiffs make no allegation that this product can be purchased without the assistance of a broker or agent, which would be the only conceivable context in which an applicant would be provided "only" the language of the policy, and plaintiffs do not come within that theoretical group. (Cf. *Countryside Financial, supra,* 2011 WL 6325877, at p. *9 [plaintiff's attempt to show " 'uniform conduct likely to mislead the entire class' " by relying "exclusively on the written documents . . . ignores the nature of the transaction as one that involves not only the exchange of written documents but also considerable oral and written discussions between the individual borrowers and their brokers"].)

Thus, contrary to plaintiffs' view, this is not a situation where certification might be proper even if members of the class were required to individually prove damages. Rather, as in *Kaldenbach, liability* could not be established on a class-wide basis. (See *Kaldenbach*, *supra*, 178 Cal.App.4th

31

at p. 848 [finding individual issues—such as "whether any given agent took [the insured's] training, read its manuals, and routinely followed the training and materials; and what materials, disclosures, representations, and explanations were given to any given purchaser"— predominated because "[t]hese individualized issues go not to the injury suffered by a purchaser, but to whether there was in fact an unfair business practice"].)

Fairbanks provides further support. In that case, the court acknowledged, under similar circumstances, that individual issues may still predominate even if certain questions are capable of common proof. For example, it stated "that whether *marketing materials produced by Farmers* made representations of permanence was subject to common proof, but whether those materials were conveyed to prospective policyholders, or other representations of permanence were made, was not." (*Fairbanks, supra,* 197 Cal.App.4th at p. 559.) And even though the court acknowledged, albeit in dicta, that "policy language clearly is amenable to common proof" (*id.* at p. 564), it went on to opine in the context of fraudulent concealment and misrepresentation UCL claims that it would be "impossible to consider the language of the policies without considering the information conveyed by the Farmers agents in the process of selling them." (*Ibid.*) Thus, *Fairbanks,* as well, supports the trial court's reasons for denying class certification here.[8]

_____

[8] *Fairbanks* also makes clear why cases like *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, cited by plaintiffs, are inapposite. There, the trial court certified a class of persons who bought " 'vanishing premium' " life insurance products in an action asserting violations of the UCL where the plaintiffs alleged, and had evidence supporting their claim, that at the time they purchased their policies the insurer had already developed plans to " 'ratchet down' " the discretionary dividend it was paying on policies and the insurer failed to disclose to purchasers or its agents that it did not intend to maintain the current high discretionary dividend rate utilized by sales agents in sales presentations.

32

Plaintiffs' assertion that the integration and modification clauses in the Trendsetter LB policy foreclose any extrinsic evidence is also misdirected. The referenced provisions state: "This policy, any amendment(s) or endorsement(s), and a copy of the application(s) and any questionnaires for issuance or Reinstatement of this policy attached to it contain the entire contract between you and us.  Any statements made in such application(s), questionnaires or any amendments either by you or by the Insured will be considered representations and not warranties.  Also, any written statement made either by you or by the Insured will not be used to void this policy nor defend against a claim under this policy unless the statement is contained in the application(s), questionnaires or any amendments thereto. [¶] Any extra benefit rider attached to this policy will become a part of this policy and will be subject to all of the terms and conditions of this policy unless we state otherwise in the rider."  They further provide:  "No agent or other person has the authority to change or waive any provision of this policy."

That a contract has an integration clause does not prohibit the consideration of extrinsic materials relevant to understanding the *meaning* of its terms.  Nor—assuming interpreting the policy discloses a possible misrepresentation or concealment—would referencing communications with policyholders which could disclose or clarify those facts *for purposes of liability under the UCL* alter the terms of the agreement.  In sum, the integration and modification provisions cited by plaintiffs are irrelevant to the issue before us.

---

(*Id.* at pp. 1286, 1291.)  The distinction is between cases where a common misrepresentation or concealment establishes liability and ones where it does not, which is the case here.

## DISPOSITION

The judgment is affirmed. Transamerica is entitled to its costs on appeal.

_____

Banke, J.

We concur:

_____

Humes, P. J.

_____

Langhorne Wilson, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BRIAN GUTHRIE, et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>TRANSAMERICA LIFE INSURANCE COMPANY,<br><br>    Defendant and Respondent. | A171526<br><br>(Alameda County<br>Super. Ct. No. RG21098977)<br><br>    ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>    [NO CHANGE IN JUDGMENT] |

**BY THE COURT:**

The opinion in the above-entitled matter, filed on May 27, 2026, was not certified for publication in the Official Reports. After the court's review of the request for publication under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

Dated:

_____
                    Presiding Justice

36

Trial Court:    Alameda County Superior Court

Trial Judge:    Hon. Noël Wise

Counsel:

Feinstein Doyle Payne & Kravec, LLC, Joseph N. Kravec, Wyatt A. Lison, John Peter Worgul, Kaitlyn M. Burns and Ruairi McDonnell for Plaintiffs and Appellants.

Edison, McDowell & Hetherington, LLP, Jodi Krystyn Swick, Hanqui Liu, Kendall J. Burr and Jay M. Patterson for Defendant and Respondent.

A171526, *Guthrie v. Transamerica Life Ins. Co*